50 So.2d 847 (1951)
VALENCE et al.
v.
LOUISIANA POWER & LIGHT CO. et al.
No. 19624.
Court of Appeal of Louisiana, Orleans.
February 26, 1951.
*848 Aubrey C. Evans, New Orleans, for plaintiffs and appellees.
Monroe & Lemann, J. Raburn Monroe, Walter J. Suthon, Jr. and Jack A. Bornemann, all of New Orleans, for Louisiana Power & Light Co., defendant and appellant.
Frank T. Doyle and Robert C. Hughes, New Orleans, for Hartford Accident & Indemnity Co., defendant and appellant.
JANVIER, Judge.
Mrs. Mozella Theriot Valence, wife of Anthony Valence, was a passenger in a motor bus of Louisiana Power and Light Company on February 28th, 1949, when it was driven off the highway into a ditch alongside. At the time Mrs. Valence was from two to four months pregnant. On August 12th, 1949, about five and one-half months after the accident, the child with which she had been pregnant was born dead.
Mr. and Mrs. Valence brought this suit for damages against Louisiana Power and Light Company and Hartford Accident and Indemnity Company, its liability insurance carrier, alleging that the accident resulted from negligence of the operator of the bus and that many injuries were sustained by Mrs. Valence, and particularly that the death of the unborn child, prior to its birth, was the result of those injuries, and therefore was a result of the accident.
Mr. Valence prayed for solidary judgment against the two defendants in the sum of $15,000. He claimed $5,000 as representing the amount spent for medical and hospital bills and the loss of earnings of Mrs. Valence for a period of twenty months, and also as the cost of employing someone to "attend" to Mrs. Valence, and $10,000 as a recompense for the "mental anguish, disappointment and grief caused by the present and future loss of companionship of the expected child."
Mrs. Valence prayed for solidary judgment against the two defendants for $30,000, $15,000 of which she claimed for "past, present and future pain and suffering", and $15,000 for the "mental anguish, disappointment and grief caused by the present and future loss of companionship of the expected child."
The defendants denied that the accident resulted from negligence of the bus driver and they denied that Mrs. Valence received any injuries at all, and they especially alleged that "she received no injuries which in any way affected the birth of her child."
There was solidary judgment against the two defendants in favor of Mrs. Valence for $15,000 and in favor of Mr. Valence for $12,500. Both defendants have appealed devolutively and suspensively.
In oral argument counsel for defendants have admitted that though they have not conceded that there is liability, they feel that the principal issues are whether Mrs. Valence was seriously injured and whether *849 the loss of the child was the result of the accident, and they further contend that, regardless of the cause of the loss of the child, as a matter of law there can be no recovery for such loss.
The record leaves no room for doubt that the accident, such as it was, resulted from the negligence of the driver of the bus. A passenger had boarded it only a very short time before the accident occurred, and the operator had turned to give change to this passenger and had thus diverted his attention from the operation of the bus, and had allowed it to swerve to its side so that its wheels went into a ditch alongside the highway.
The record shows that instead of permitting the passengers to alight, the driver attempted to extricate the bus by driving it first backward and then forward several times and that only then, after hearing protests from some of the passengers, did he allow them to alight.
We conclude that for such injuries and losses as were sustained the defendants are liable.
The major item of loss claimed is based on the fact that the expected child was born dead, and since there is presented by the defendants the contention that for such an item of loss or damage there can be no recovery as a matter of law, we deem it proper to discuss that legal question first because if there can be no such recovery, regardless of the cause of the loss, then there is no necessity to consider or discuss the extensive medical testimony touching upon the question of whether the stillbirth of the child was the result of the accident.
Counsel for defendants direct our attention to Article 28 of our Civil Code which provides that: "Children born dead are considered as if they had never been born or conceived."
They say that since a child born dead is considered as never having been conceived, it must be concluded that nothing has been lost since there can be no loss of anything that has never existed.
We note that in Youman v. McConnell & McConnell, Inc., 7 La.App. 315, the Court of Appeal for the Second Circuit in a simlar situation said that even if it could be conceded that the "stillbirth of the child" had been caused by the accident "we do not think the mother could have a right of action for the loss or death of the child."
Cooper v. Blanck, La.App., 39 So.2d 352, 353 affords us little assistance in the solution of this problem. It is true that there the child received injuries "en ventre sa mere" and we said: "* * * if the child be killed at this period, before its birth, we see no reason why its parents cannot maintain an action for the death of their child." The truth of the matter was, however, that there the child lived several days after its birth and the question was whether the parents could inherit from the child, which had been born alive, the right to recover for injuries sustained prior to its birth. Obviously in the above quoted statement we indulged in obiter dicta.
We note an interesting discussion on the subject of "Tort Liability for Prenatal Injury" in 24 T.L.R. at page 435, and particularly at pages 439 to 441.
The author says that the general rule is that: "There can be no recovery for the loss of the society and prospective earnings of the child." * * *
We cannot be persuaded that, under no circumstances, should there be awarded damages to the parents of the unborn child if the foetus, while in its mother's womb, has been so injured that it cannot be born alive. We are certain that the redactors of our code had no such purpose in mind in enacting Article 28.
There can be no doubt at all that there could be a recovery for a result of an accident which might cause sterility, or which might otherwise prevent parents from having children. If, as the result of actionable negligence, a husband or a wife should be so injured that either, in the future could not expect to produce children, surely this would be taken into consideration as an item of damage. It necessarily follows, we think, that when parents are actually expecting the arrival of a child, and they are deprived of the fruition of that great expectation by the actionable negligence *850 of someone else, they may recover from the tortfeasor as an item of damage for that particular loss.
In the article from which we have quoted the author says that: * * * "Although mental anguish based specifically upon the loss or death of the child is not recoverable, recovery has been allowed for the mother's mental anguish if the child is born malformed." * * * If the mother may recover for the mental anguish caused by the fact that the child has been born malformed, it is surely illogical to hold that, under the same circumstances, the mother cannot recover where, as the result of negligence, the child is prevented from coming into existence at all.
In the same article the author states that, where there is an injury to an expectant mother and a space of time elapses between the injury and the expected birth, "there may be recovery for the fear that harm may have resulted to the child." If this is true, surely it should follow that if that fear is realized and the child is stillborn, there should be allowed recovery for the stillbirth of the child.
As a matter of fact, the author of the article concludes his most interesting discussion with a statement that, in all such cases in which it is contended that some accident has caused prematal injuries, "* * * the evidence to prove the causal relationship should be subjected to the strictest examination."
And that is our conclusion herethat as a matter of law, there may be recovery by the parents where there is actionable negligence which causes such injury to a viable foetus as to prevent its being born alive, but that there must be strict proof that the actionable negligence was the cause of the unfortunate occurrence.
We therefore next consider the question of whether there is sufficient proof as to the cause of the stillbirth of the child to permit that item of the claim to be considered in arriving at the awards to be made to the parents. There are, of course, other items of damage which we shall later discuss.
We are well convinced that no great shock resulted from the fact that the bus was driven into the ditch, nor from the fact that the driver attempted to extricate it before allowing the passengers to alight.
Although, in certain parts of the record, it is contended that Mrs. Valence was thrown to the floor of the bus, it is very clear that this did not occur; that she caught herself on the seat ahead of her and received, as a matter of fact, only a slight jolt.
She did not feel well after the occurrence being between two and four months pregnant, and finding that she was suffering from a slight discharge from the uterus, she called her physician, Dr. LaRocca. He had examined her only three days before the accident and had found her in splendid condition except that she was very much overweight. Learning of this discharge from the uterus and having been told of the accident, Dr. LaRocca sent her to the hospital on March 4, which was several days after the accident, and required her to remain there until March 14, on which day he discharged her and told her to return to her home. He was asked whether, at that time, the threat of the abortion had dissipated, and he said: "As far as I was concerned, it was over with." And he also said: "I thought she was going along with a normal pregnancy."
The medical experts placed on the stand by the defendants testified that there could be no doubt at all that if the accident had had any effect, such as is contended for by the plaintiffs, the result would have been realized very much soonerin fact, within a week or so of the occurrence, and they all stated, as did the physicians placed on the stand by the plaintiffs, that there could be no doubt at all that the foetus continued to be viable after the accident and that just before it was stillborn, it was still viable and had developed normally, except that it had reached the extraordinary weight of fourteen pounds.
On what then is based the present contention that the stillbirth is chargeable to the accident? The contention is that the accident made it necessary that Mrs. Valence *851 remain in bed for a large part of the time; that she remained inactive and took no exercise, and that as a result her weight became very excessive, with the secondary result that the weight of the viable foetus became also excessive and that, as a consequence, the foetus itself grew so large that it could not be born alive.
Dr. LaRocca, the attending physician, did not attribute the stillbirth directly to the accident. He said: "I did not say the trauma caused the death. I said that the oversize of the baby, and the abnormal circumstances of her pregnancy, were the cause of the death of the baby." He explained that what he meant by "abnormal" condition of her pregnancy was the fact that Mrs. Valence was confined to her bed for long periods, with the result that she and the baby grew to abnormal proportions. And Dr. Maurer was told that Dr. LaRocca had discharged Mrs. Valence from the hospital because he felt that the threat of the abortion had disappeared, and he was asked whether, based on these facts, he would say that: "Neither the woman nor the baby received any injury in this accident, which would affect the birth of the baby?" He answered: "I would assume that, if I were treating the case; yes."
In spite of the testimony of Dr. LaRocca and Dr. Maurer, we are of the opinion that the overwhelming weight of medical testimony is to the effect that these factors had nothing to do with the somewhat abnormal development of the foetus.
We see no necessity to discuss in detail the testimony of the doctors on this point, and find it sufficient to say that we are convinced that nature takes care of such situations and that so long as an expectant mother receives sufficient nourishment, the size of the baby is not affected by the quantity of food which the mother may take over and above what is actually necessary. These doctors are certain that no matter how much an expectant mother may eat, the foetus absorbs only so much as nature requires, and that its size does not depend at all on the quantity of food taken by the mother. These doctors also say that, without any question, the fact that the mother is required to remain in bed for several hours each day and that she is permitted to take little or no exercise does not affect the size of the foetus.
We conclude, as we have stated, that the abnormal size of the foetus was not the result of the fact that the mother herself was tremendously overwight and that she was required to remain inactive for several hours each day.
In reaching this conclusion we have not been able to lose sight of the fact that the record strongly suggests another cause for the abnormal size of the unborn foetus. All of the doctors agree that diabetes of a mother is almost always the cause of abnormal growth of the foetus. While Dr. LaRocca stated that Mrs. Valence did not have true diabetes, he conceded that she had what he said was "transitory" diabetes, and the diet which he required for her was one which is recognized for diabetics. He says that: "She was on a low carbohydrate diet, calculated by the Smith Institutewhich is recognized as the diets for diabetics." He says, too, that he took into consideration the fact that Mrs. Valence was much overweight and that she was to be confined to her bed for long periods and prescribed a diet accordingly, and he very significantly added: "if she had lived up to it her weight would have been reduced."
The medical experts who testified on behalf of defendants stated that they knew of no such disease as transitory diabetes. They are all of the opinion that there is no middle ground between the diabetic and the non-diabetic. And there can be no doubt that the overwhelming medical testimony shows conclusively that the percentage of abortions and stillbirths among diabetic women is tremendously greater than among women not so affected.
Dr. LaRocca was asked: "Do you know that the fetal mortality rate in diabetic women is about 60%?" And he answered: "In true diabetics; yes." He was asked whether the fetal mortality rate in normal women is from 2% to 3% and he answered: "Yes". He also made the following statement: "The diabetic obstetrical course of patientsthere are all sorts of *852 pitfalls that you have to watch for during the entire pregnancy."
But even if it could be conceded that the size of the baby was not the result of the mother's tendency to diabetes and was not the result of the extreme overweight of the mother or of her long periods of rest, still there is no proof whatever that its size was the cause of its being stillborn. Dr. LaRocca knew of its size. He had made all necessary examinations of the mother and at the time he knew of nothing which would have prevented her from giving normal birth to a child even of that size.
We cannot say how much significance should be attached to it, but we have not been able to lose sight of the fact that although Mrs. Valence had given normal birth to her first child, which was still living, she had, some five years before the present occurrence, given birth to another stillborn child, thus possibly indicating a tendency which may have been felt at this time.
Dr. Maurer, referring to the first stillbirth, said:
"There is a very small possibility that it could have had any effect."
Our conclusion is that at most all that can be said is that there was a sequence of events which may have led a layman to feel that the stillbirth was the result of the accident, but that the overwhelming medical testimony makes it impossible that we accept that conclusion, and we have decided that no allowance should be made for the fact that the child was not born alive.
We do feel that there should be an award for each parent for the worry and mental anguish which no doubt existed for some time, even substantially beyond the time at which Dr. LaRocca felt that the threat of abortion had disappeared. And we further feel that there should be an award to Mrs. Valence for such additional suffering and injuries as she actually sustained as a result of the accident, and to Mr. Valence, in addition to his worry and mental anguish, for such actual expenses as he may have sustained.
There is no doubt that Mrs. Valence suffered and is suffering from multiple ailments and illnesses, and so far as the record shows she apparently did not suffer from most of them prior to the accident. However, it is more than doubtful if these conditions resulted from the accident. For instance, according to Dr. Maurer, she is now suffering from "* * * an undue amount of lardosis of the lumbar spine; and an undue amount of kyphosis of the dorsal spine." But there was no attempt at all to show that these conditions resulted from the accident and when we realize that the jolt sustained by Mrs. Valence was not excessive, we feel that these conditions could not have been caused by trauma, for Dr. Maurer describes them as follows: "* * * an abnormal anterior posterior curve in the upper and lower spine."
Surely if these abnormal spinal conditions were caused by the severity of the jolt sustained in the accident, they would have been discovered by Dr. LaRocco when he examined Mrs. Valence immediately after the accident. Obviously, he found no such condition. Dr. Maurer's examination, in which they were discovered, was a long time afterwards.
Dr. Maurer also said that she is now suffering from osteo-arthritis of both sacroiliac joints. But here again the record abundantly shows that this condition did not result from the accident. In fact, when Dr. Maurer was asked whether he could say that the accident had caused it, all he could say was:
"Well, * * * anything is possible. I'd say it is possible."
Mrs. Valence also seems to have been suffering from hypertension, which we understand is high blood pressure and which had no connection with the accident.
As we have already said, there is a tremendous record of medical testimony. We have tried to analyze it carefully. As a result we have reached the conclusion that none of Mrs. Valence's present ailments can be attributed to the accident, though we feel certain that as a result of it their effect was felt sooner than would have been *853 the case had there been no accident. We think, too, that her suffering from these ailments was more acute than it would have been under normal conditions. There can be no doubt that she did sustain some injury and that, as a result, she was hospitalized and later kept in bed for substantial periods of time, and that for quite some time both she and her husband were fearful that there might be an abortion.
She thus seems to be suffering from various ailments to which all flesh is heir and to which she, because of her obesity and her tendency to diabetes, is particularly vulnerable. That she no doubt would have suffered from most of her ailments even had there been no accident does not make it necessary that we deny recovery for the results of those ailments, nor for the fact that her sufferings therefrom were accelerated.
The question of whether, in assessing damages in a tort action, there should be taken into consideration the fact that the plaintiff was already suffering from ailments or diseases which, though not caused by the accident, were lighted up or aggravated by it, is an interesting one.
It is settled that, in a compensation case, where a plaintiff, though suffering from ailments or diseases prior to an accident, is nevertheless able to do such work as he is customarily engaged in and is injured so that as a result of the prior condition, aggravated by the injury, he can no longer engage in his previous occupation, he is entitled to recover the full amount of compensation specified in the compensation laws.
And it is also settled that in a tort action the fact that an injured person was previously suffering from damages or ailments does not prevent recovery for such additional suffering or disability as may have resulted from the accident. Trascher v. Eagle Indemnity Co. of New York, La. App., 48 So.2d 695; Lapleine v. Morgan's L. & T. Railroad and Steamship Co., 40 La.Ann. 661, 4 So. 875, 1 L.R.A. 378; Poncet v. South New Orleans Light & Traction Co., 3 La.App. 64.
But this does not mean that in a tort action there may not be taken into consideration the fact that the accident did not initially cause the condition which, because of previous ailments or diseases, was, to some extent, already in existence.
In Caldwell v. City of Shreveport, 150 La. 465, 90 So. 763, 764, the Supreme Court, in reducing an award in damages, said: "* * * It appears that the district judge did not make allowance for the fact that plaintiff's infirmity was not all due to the accident. We have concluded, therefore, in the exercise of our discretion, to reduce the allowance for the personal injury from $3,000 to $2,000."
It therefore becomes especially difficult to determine just what part of her suffering should be chargeable to the accident and to determine just what part of the expenses incurred should be placed upon the shoulders of the defendants.
There are few cases in which Courts have considered the question of what should be allowed for the worry and mental anguish caused by such fear as the plaintiffs entertained. In Muller v. Herrin Motor Lines, Inc., La.App., 184 So. 406, 409, we ourselves allowed an expectant mother $750 for contusions and bruises, and we took into consideration the fact that the mother suffered mental anguish over the fear that the expected child "might be deformed at its birth." We said: "It is true that the child, when born, was perfectly normal but we readily recognize the fact that the mental anguish Mrs. Muller suffered during the period of her pregnancy was considerably aggravated by the injuries she sustained."
In Fehely v. Senders, 170 Or. 457, 135 P.2d 283, 284, 145 A.L.R. 1092, the Supreme Court of Oregon considered a case in which the plaintiff was six months pregnant at the time of the accident. Her injuries consisted of "bruises on the left side of her body to the knee, thigh, and head, a cut ear, and a blow on the abdomen caused by striking against the steering wheel of the automobile she was driving." The Court said: "Reverting now to the specific question involved in this case, we *854 have seen that in six jurisdictions the apprehension of a pregnant woman, injured in her person by the negligence of another, that harm may result from the injury to her unborn child, is such mental anguish as may be properly taken into account in estimating her damages; while in one jurisdiction only, Michigan, a contrary view has been announced, based on reasoning which we are unable to accept. We think that apprehension of that sort is the natural consequence of a blow on the abdomen such as the plaintiff suffered, or at least that a jury could so find, and that it could be mental distress the most acute. * * *" Fifteen Hundred Dollars was allowed for the physical injuries and for the mental anguish and worry.
Other cases involving somewhat similar circumstances are Elliott v. Arrowsmith, 149 Wash. 631, 272 P. 32; Gagnon v. Rhode Island Company, 40 R.I. 473, 101 A. 104, L.R.A.1917E, 1047; Prescott v. Robinson, 74 N.H. 460, 69 A. 522, 17 L.R.A.,N.S., 594.
There is no reason to believe that the condition of Mrs. Valence will be permanent. We feel that she should be allowed $2,500 for the aggravation of the diseases and ailments from which she was suffering and that she should be allowed $750 as compensation for her mental anguish and worry over the fear that the unborn foetus might have been injured or that there might have been an abortion.
When we come to analyzing the claim of Mr. Valence, we find it even more difficult because of our serious doubt as to certain claimed losses and expenditures. For instance, it is claimed that $1,000 was paid to Mrs. Jack Valence, a sister-in-law, for taking care of Mrs. Anthony Valence from April 1, 1949 to February 1, 1950. Though no other receipts were taken from third persons who performed services or to whom anything may have been paid, plaintiffs were particularly careful to take from the sister-in-law a written receipt for this $1,000.
Another item concerning which we have the gravest doubt is that of loss of earnings of Mrs. Valence at the rate of $100 per month. Of course, if there was such a loss, it could be claimed by the husband as head and master of the community. Simon v. Harrison, La.App., 200 So. 476; Kientz v. Charles Dennery, Inc., La.App., 17 So.2d 506; Houghton v. Hall, 177 La. 237, 148 So. 37. But the proof on this item is very meagre indeed.
There can be no recovery for the burial of the stillborn child for we have held that the stillbirth was not caused by the accident.
No medical bills have been paid. Mr. Valence says that on the day of the trial Dr. LaRocca told him that his bill at that time amounted to $1150. Dr. LaRocca said in one part of his testimony that he did not have a bill prepared to submit at that time, but that he thought it would amount to from $750 to $1,000, and he said that that would be for the three periods of hospitalization and all other services. The last period of hospitalization we assume was for the birth of the child and is not chargeable against the defendants.
Dr. Maurer's bill amounted to $125.
There are other minor items on which there is practically no proof. For instance, we find no proof of the amount paid to the hospital.
We have concluded that Mr. Valence should be allowed $250 for mental anguish and worry over the fear that the unborn child had sustained injury and that there might be an abortion, and $1,500 to cover that portion of expenses and losses which could possibly be charged as the result of the accident, making a total to Mr. Valence of $1,750.
Accordingly it is ordered, adjudged and decreed that the judgment appealed from be and it is amended by the reduction of the amount awarded to Mrs. Valence to $3,250, and by the reduction of the amount awarded to Mr. Valence to $1,750; plaintiffs to pay costs of appeal, all other costs to be paid by defendants.
Amended and affirmed.