383 So.2d 1019 (1980)
Darrell DANOS et al.
v.
Terry ST. PIERRE et al.
No. 12755.
Court of Appeal of Louisiana, First Circuit.
January 21, 1980.
*1020 Darryl J. Carimi, Gretna, for petitioners and appellees.
Albert Forrest, New Iberia, John Ladd Lanier, Thibodaux, Steven B. Witman, John J. Hainkel, Jr., New Orleans, for defendants and appellants.
Lloyd T. Bourgeois, Thibodaux, Harold J. Lamy, New Orleans, for defendants and appellees.
Terry B. Loup, Baton Rouge, for plaintiffs (Suit No. 84672) and appellees.
Robert Blomefield, New Orleans, for plaintiffs (Suit No. 34002) and appellees.
EN BANC.
PER CURIAM:
A basic but delicate question confronts us on this appeal: Can a fetus whose stillbirth results from the negligence of a third person be considered a "person" for purposes of the wrongful death provisions of La.C.C. art. 2315?
The issue arises in a suit for wrongful death, personal injury and property damage brought as a result of a head-on collision.[1]
The collision occurred on August 23, 1975, at about 4:00 A.M. on Louisiana Highway 1 in Lafourche Parish, Louisiana. The vehicles involved were the 1971 Chrysler automobile owned by Eroy Danos and driven by Gayle Naccio Danos in which her husband, Darrell A. Danos, was an occupant, and the 1973 Chevrolet automobile owned by Rhonda Rousse Malbrough and driven by Terry St. Pierre in which the owner and two guest passengers in the backseat, Jenny Lynn Autin and Nolan Ougel, Jr., were occupants. The accident happened when the Malbrough vehicle veered into the lane of traffic of the Danos vehicle.
Immediately before the wreck, St. Pierre and his passengers had been partying for several hours at a local nightclub where all had consumed copious quantities of alcoholic beverages. They were well acquainted with each other and they knew that St. Pierre was intoxicated when they left the nightclub. At the time of the accident Mrs. Danos was seven months pregnant, and was to be shortly thereafter delivered of a stillborn child. Jenny Lynn Autin and Rhonda Rousse Malbrough died as a result of the injuries they sustained in the accident. Mr. and Mrs. Danos, St. Pierre and Ougel were severely injured.
The plaintiffs, Darrell Danos, Gayle Danos and Eroy Danos, sued the defendants, St. Pierre, the Malbrough (Rousse) Estate, Jenny Lynn Autin, and Ougel, and the liability insurers, Aetna Life & Casualty Insurance Company and State Farm Mutual Automobile Insurance Company.[2] Later, Allstate Insurance Company, the Danos' uninsured motorist carrier, was added as a defendant, as was Southern Farm Bureau Casualty Insurance Company, as the insurer of Autin, whose death occurred after suit was filed.
*1021 The plaintiffs alleged that the collision was caused by the joint negligence of Terry St. Pierre, in that he was driving an automobile while under the influence of intoxicating beverages, driving at an excessive rate of speed and crossing the center line of the highway into the path of oncoming traffic; and of Jenny Lynn Autin, Nolan Ougel, Jr. and Rhonda Rousse Malbrough, all of whom were passengers in the Malbrough vehicle, and whose negligence was alleged to have consisted of their having been fully aware of St. Pierre's intoxicated condition and of their failure to take steps to prevent him from driving the Malbrough car.
The trial court held that the collision resulted from the joint negligence of the driver and the occupants of the Malbrough vehicle, and awarded judgment in favor of the plaintiffs against all defendants. The defendants, except Ougel, have appealed; he is not before this court and the judgment is final as to him.
The principal issues before us concern:
(1) Whether the parents of a child born dead can recover for its wrongful death.
(2) Whether the owner of an offending vehicle who allows a person she knows is intoxicated to operate her vehicle is guilty of actionable negligence.
(3) Whether the guest passenger of an offending vehicle who knows or should know that the driver is intoxicated is, by such knowledge, answerable solidarily with the driver pursuant to La.C.C. 2324.
There is also a procedural question concerning the validity of the judgment against the Malbrough (Rousse) Estate and an issue of quantum.

WRONGFUL DEATH
It is the holding of a majority of this court that plaintiffs have a cause of action and can recover damages for the loss of their child, which was stillborn as a result of the accident herein. Reasons for and against this holding will be expressed in concurring and dissenting opinions, to be attached hereto.

LIABILITY OF AUTOMOBILE OWNER
The driver of the Malbrough car, Terry St. Pierre, was undoubtedly negligent. He was operating the car while in an intoxicated condition which caused him to invade the traffic lane of the Danos automobile at a high rate of speed and collide head-on with it. The trial court found, and the evidence supports its finding, that Rhonda Rousse Malbrough, the owner, knew that St. Pierre was intoxicated to the point where he was in no condition to drive when she entrusted the car to him.
We thus have no difficulty in affirming the trial court's holding that the owner of the Malbrough vehicle was negligent and was solidarily liable with the driver. It is established law that the owner of an automobile who knowingly entrusts it to an intoxicated, or otherwise incompetent, driver is responsible for the harm resulting from the incompetent operation of the vehicle. Baader v. Driverless Cars, Inc., 10 La. App. 310, 120 So. 515 (Orl.1929); see also Kemp v. Fourmy, 265 So.2d 651 (La.App. 2 Cir. 1972); Winzer v. Lewis, 251 So.2d 650 (La.App. 2 Cir. 1971), writ refused, 259 La. 934, 253 So.2d 379 (1971); Annot., Liability Based on Entrusting Automobile to One Who Is Intoxicated or Known to be Excessive User of Intoxicants, 19 A.L.R.3rd 1175.

LIABILITY OF GUEST PASSENGERS
In holding the guest passengers, Autin and Ougel, solidarily liable with the driver, the trial judge stated:
"The claims in the companion suits were dismissed against the plaintiffs in this suit and the other defendants in each of those suits because the court felt the evidence had established a clear case of assumption of risk by the three guest passengers. This finding was sufficient to deny recovery in those suits. The court finds as a fact, however, that the guest passengers in the Rousse (St. Pierre) vehicle were also joint tort-feasors with the *1022 driver, Terry St. Pierre, and hence they, their insurers, and their estates are liable to the plaintiffs in this case."
The trial court's holding was based on its finding that the St. Pierre group had been partying together for several hours at a nightclub and that all members of the party knew that St. Pierre was in an intoxicated condition when they left the club. The holding was apparently based on La.C.C. art. 2324, which provides:
"He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act."
The decision of the trial court was premised on the awareness of the guest passengers of the intoxicated condition of the driver. Finding as a fact that the passengers knew of St. Pierre's excessive intoxication, the trial court concluded that the guest passengers, including the owner, had thus assumed the risk, which barred their own recovery.
The trial judge, from this finding and holding, then assumed that the guest passengers were necessarily joint tortfeasors. Putting it mildly, this is a non sequitur. The mere fact that a guest passenger is precluded from recovery of damages because of assumption of risk or contributory negligence does not inexorably lead to the conclusion that he has breached a duty owed to some third person injured as a result of the accident.
We find from the facts and circumstances of the instant case that there was no special relationship between Autin and the driver, or between Autin and the injured third persons, which imposed a duty upon her to persons outside of the vehicle. Mere knowledge or awareness of the intoxicated condition of the driver, alone, does not create a relationship which imposes a duty upon a guest passenger to protect against the particular risk involved in the instant case. Sloan v. Flack, 150 So.2d 646 (La.App. 3rd Cir. 1963).
This position is consistent with the rule that before a plaintiff can recover from a passenger in the defendant's motor vehicle, he must show a joint interest of the driver and the passenger or an equal right in the passenger to control the driver's operation of the vehicle. Malbrough v. Davidson, 219 So.2d 313 (La.App. 1st Cir. 1969), writ denied 254 La. 10, 222 So.2d 66 (1969). We find nothing in this case to take it out of that general rule.
There is nothing in the record that shows that the passenger had any control or custody over the motor vehicle. She had no interest in the automobile which she could entrust to the driver. The evidence does not establish that Autin was in control of the driver; nor is there evidence of intimidation or forceful persuasion by her. On the basis of the evidence in this record we cannot be persuaded to extend Article 2324 to hold the guest passenger liable for the plaintiff's damages.
Therefore, we reverse the trial court's finding of fault on the part of Jenny L. Autin.

WAS THE MALBROUGH (ROUSSE) ESTATE PROPERLY BEFORE THE COURT?
The original petition alleged that Rhonda Rousse Malbrough, the owner of the Chevrolet automobile, being fully aware of the driver's intoxicated condition, entrusted the vehicle to him and therefore that the Malbrough (Rousse) Estate, through the administrator of her Estate and/or her heirs, was liable for the damages. It was alleged that her Estate and her insurer were jointly liable with St. Pierre, the negligent driver. The record shows that the Estate, through the succession representative, filed responsive pleadings, made an appearance in the suit and participated in the trial. Thus, we find this party was properly before the court and could have been, as it was, cast in judgment. See La.C.C.P. arts. 6, 7, 925 and 3249; Crane Supply Company v. Drake & Planche, Inc., 255 So.2d 188 (La.App. 4th Cir. 1971).

*1023 QUANTUM
The appellants contend that the awards of $10,000.00 and $20,000.00 to Darrell Danos and Gayle Danos, respectively, for their personal injuries were excessive and should be reduced. In making his awards, the trial judge said:
"We now turn to an award for pain and suffering by plaintiff Darrell Danos. Simply put, his face was fractured. He was first seen by his local doctor, Dr. William George, but because of the nature of his injury he was referred to Dr. James Peltier, an oral surgeon, accepted as an expert by all parties. Dr. Peltier testified that plaintiff Darrell Danos had sustained a fracture of the upper jaw, which in essence totally severed it from the bony structure of the head. There was apparently no laceration, but the fracture was the result of the violent blow received when plaintiff Danos, who was riding in the right front seat of the car, struck the dashboard as a result of the head-on collision. The force of the blow impacted the jaw, which in this case was an advantage in that it helped immobilize the jaw and simplified the treatment. The fracture extended from the middle of the upper jaw on each side of the nose and then the bones over each eye. Dr. Peltier immobilized it with metal plates and wired the jaw shut. This was done following the day of the accident and the situation was static until September 24th, at which time the wires and elastic bands were removed, but the bars or plates were left in place. On October 10th he removed the remaining appliances from his mouth. From Dr. Peltier's testimony and from plaintiff's appearance it was obvious that despite the extensiveness of the facial fracture good results were obtained in treatment. Despite the doctor's assurance that the procedure was not excruciatingly painful, pain is a subjective thing and from the doctor's description of the treatment and the plaintiff's testimony, there is no doubt in the court's mind that for a period of several months after the accident plaintiff was in great discomfort. In addition to this, the accident required repair for a deviated septum. This, too, was a success, but again there was considerable discomfort involved in this surgical procedure. The only other injury to plaintiff Darrell Danos involved an apparent infection to the tear duct of the left eye which was cleared up with three visits to Dr. James Bourgeois. (See Danos-15). Under the circumstances, an award of Ten Thousand and no/100 ($10,000.00) Dollars for pain and suffering for plaintiff Darrell Danos for the injuries he received would seem to be reasonable. This award is sufficient, also, to compensate him for any mental anguish he may have suffered in connection with his own injuries. We reserve for later in these reasons plaintiff Darrell Danos' claim for the loss of the [sic] `his unborn baby girl'.
"We turn now to damages to be awarded to Mrs. Gayle Danos for her pain and suffering. It was obvious from the medical testimony and evidence that her primary injury was a severe blow in the lower abdominal region, apparently caused by the steering wheel, as a result of the head-on collision. Since Mrs. Danos was experiencing abdominal pain and was approximately six (6) months pregnant, she was kept in the hospital, The Lady of the Sea in Galliano, Louisiana, from the date of the accident until August 30th. During this period she was taken to St. Ann Hospital in Raceland, Louisiana, for examination and it was determined that the child she was carrying was dead. Dr. Frederick Cardwell, accepted as an expert in obstetrics and gynecology, saw her on August 27th, 1975, and he testified that the baby's death was caused by the accident. To the best of his recollection he advised Mrs. Danos and her mother-in-law that in his opinion the baby was dead at the time of this examination. On September 2nd she began having severe pains during the night and called her in-laws, who picked her up to take her to the hospital. When they put her on the stretcher in the parking lot, the dead child spontaneously *1024 ejected from the womb stillborn. In contradiction of Dr. Cardwell's testimony, both plaintiff Gayle Danos and her mother-in-law, Mrs. Eroy Danos, testified that after the examination on August 27th the doctor had told only Mrs. Eroy Danos of his belief that the child was dead. With this conflicting testimony, it cannot conclusively be determined whether plaintiff Gayle Danos knew or did not know in advance that the child had been killed in the accident, but in assessing the measure of damages one situation would seem almost as mentally agonizing as the other. Is there a greater anxiety and mental suffering for a mother carrying her first child in her womb to know she is carrying a dead child, or since movement had ceased to wonder if she is carrying a dead child? Monetary compensation would seem woefully inadequate in either circumstance, but it is the only compensation that can be afforded. Considering the fact that this was her first child and that there were ten days of uncertainty preceding the stillborn delivery, coupled with the final knowledge that indeed she was to be denied the joy of motherhood at this time, an award of Twenty Thousand and no/100 ($20,000.00) Dollars for her pain and suffering and mental anxiety does not seem unreasonable to this court."
Based on the evidence in this case, any reduction of the awards granted Mr. and Mrs. Danos would simply be a substitution of our opinion as to proper quantum for that of the trial court. In view of the injuries sustained and the much discretion allowed the trier of fact in compensating such injuries, we find no manifest error in the awards. La.C.C. art. 1934(3); Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976); Beal v. New Orleans Public Service, 365 So.2d 1118 (La.App. 4th Cir. 1978).

DECREE
Therefore, for the above and foregoing reasons, the judgment of the trial court rendered against Jenny L. Autin is reversed, and in all other respects, the judgment of the trial court is affirmed at defendants-appellants' costs.
REVERSED IN PART AND AFFIRMED IN PART.
ELLIS, LOTTINGER and PONDER, JJ., concur and assign written reasons.
CHIASSON and SARTAIN, JJ., concur for reasons assigned by ELLIS, J.
EDWARDS, J., concurs for the reasons assigned by ELLIS and PONDER, JJ.
COLE, J., concurs for reasons assigned by LOTTINGER, J.
COVINGTON, J., dissents in part, for reasons assigned and concurs in part.
ELLIS, Judge, concurring:
I believe that it is unnecessary to classify a fetus as a person, thing or non-person in order to reach the result herein. In my opinion, the fact that the prospective parents have lost a child, which would otherwise have been born normally, because of the wrongful act of another, is sufficient to create a right of recovery under the first sentence of Article 2315 of the Civil Code. The elements of fault and damage are clearly satisfied.
I do not believe that Articles 28 and 29 of the Civil Code were intended to cover a case such as this, when the death of the fetus is caused by the wrongful act of another. However, those articles do preclude the acquisition or transmission of a cause of action by the fetus, which, by law, never acquires personality if born dead.
I therefore concur in the result.
LOTTINGER, Judge, concurring.
I concur with the decision of this court to allow parents to recover for the wrongful death of a stillborn child for the following reasons.
In allowing the parents to recover, the trial judge refused to follow this court's latest expression that there can be no recovery for the wrongful death of a stillborn child. Wascom v. American Indemnity Corporation, 348 So.2d 128 (La.App. 1st Cir. *1025 1977), writ refused 350 So.2d 1224 (La.1977). This court in Wascom, following the lead of a 1927 Second Circuit case, Youman v. McConnell & McConnell, Inc., 7 La.App. 315 (La.App. 2nd Cir. 1927), held that Louisiana Civil Code Article 28 precludes recovery for the death of a stillborn child. This writer dissented, arguing that La.C.C. arts. 28 and 29[1] when read together applied only to succession and inheritance matters.
Where this court and this writer failed in Wascom was in not tracing the historical development of Article 28.
The history of Article 28 of the Louisiana Civil Code of 1870 runs deep into the rich past of this state. More important, history will show that Article 28 was never intended to block the right of parents to recover for the wrongful death of their unborn child.
Article 28 states simply that "Children born dead are considered as if they had never been born or conceived." The article appears in Book I, Title I of the Civil Code, relating to the distinction of persons. It was taken verbatim from Article 28 of the Civil Code of 1825, which in turn was taken verbatim from Book I, Article 5 of the Digest of 1808.[2]
The compilers of the Digest of 1808, in a handwritten reference to the source of Article 5,[3] gave as the prime source of that article a similar provision in Las Siete Partidas, an old Spanish law codification upon which much of Louisiana's codal law is based. The De La Vergne Volume of the Digest of the Civil Laws Now in Force in the Territory of Orleans (1808). The reference is to Partida Seven, Title 33, Law 8,[4] which in pertinent part reads: "We also decree that children who are born dead are not born at all, or reared; and therefore a will made by their father or mother cannot be broken on their account. Moreover, we *1026 decree that such as are born in the semblence of animals, or contrary to the usual custom or practice of nature, and are, as it were, monsters, shall not be called children. Matters of this kind we discussed fully in the Title which treats the Condition of men, which is inserted in the Fourth Partida of this our book."[5] Title 33 of the Seventh Partida deals with the words and matters used throughout Las Siete Partidas.
The direct connection in Law 8 between stillborn children and the effect of their birth on previous wills is a clear indication that inheritance rights were the sole consideration in the Spanish law dealing with stillborns.
From the time the Partidas were compiled to the time the Civil Code of 1870 was codified, there was no such thing as a wrongful death action in Louisiana. Not until 1884 was Article 2315 amended to create an action for wrongful death.[6] Thus, considering that the source provisions of Article 28 dealt solely with the problem of stillborn children in relation to successions and inheritances, and that a wrongful death action did not exist in Louisiana at the time that this article was placed in the Civil Code, we must conclude that the redactors never had any intention that Civil Code Article 28 act as a stumbling block to or preclude a wrongful death action for a stillborn child.[7] Necessarily, then, our reliance on Article 28 in Wascom, and the Second Circuit's reliance in Youman, were misplaced and in error.
It also becomes obvious that the redactors of Article 28 were speaking of natural vis-a-vis unnatural causes when they spoke of the death of the stillborn child. Natural causes fall more into line with the historical examination of Article 28 and its relationship to successions and inheritances.
The defendants argue that when Act 71 of 1884 amended Article 2315 to authorize a wrongful death action, that amendment took the then existing law as it found it, which was that a child born dead was considered as if it had never been born or conceived. Where the defendants fall into error is in attempting to apply an interpretation of a codal article which was never intended.
The defendants also argue that if the above-expressed view of Article 28's purpose is correct, then that article becomes merely repetitive of the Civil Code articles dealing with unborn children in the succession section of the code. Articles 953-963. I agree with the defendants that Articles 28 and 29 are closely related to Articles 953 through 963, but I also feel that the latter articles represent a refinement of the general principles enunciated in the former articles. None of these articles is rendered nugatory by the decision today. Rather, the scope of these articles is confined to the intent the legislature originally had in mind in enacting them.
Since I have concluded that Article 28 was never intended to prohibit and nor does it prohibit a wrongful death action for a stillborn child, I would therefore overrule Wascom[8] and proceed to determine whether *1027 such an action can exist in Louisiana, and if so, under what circumstances.

Is the Fetus a "Person"?
Besides containing the broad statement concerning general delictual responsibility of tortfeasors, Article 2315 provides an action for wrongful death of a "person," inuring to those who are given the right to sue for the injured person's personal damages should that person die.[9] Nowhere in Article 2315 and nowhere in the chapter in which Article 2315 appears is the word "person" defined. And, as noted in the discussion of Article 28, none of the other articles in the Civil Code dealing with children and stillborns can be read in pari materia with Article 2315's tort provisions because those articles relate to totally different subject matters. The Civil Code's general definition of a "person," found in Article 3556's sundry terms, is a gender provision, stating in effect that when the Code uses the word person, it means both men and women. This article provides no help.
More than 50 definitions of the word "person" appear in other Louisiana statutes, an overwhelming number of which define the word in the context of the legal entities sought to be regulated by the particular statutory scheme.[10] Of particular interest, however, is the definition of "person" in Louisiana's criminal law. For purposes of the Criminal Code, "person" includes "a human being from the moment of fertilization and implantation and also includes a body of persons, whether incorporated or not." La.R.S. 14:2(7). This definition, added to the Criminal Code in 1976, reflects a legislative intent to classify an unborn child as a "person" for purposes of violent criminal conduct like homicide and battery. The definition reveals an express recognition by the legislature that life begins at the moment of conception and that this form of life can indeed be the victim of a harm, i. e., a murder or a battery.
I realize that in State of Louisiana v. Brown, on the docket of the Louisiana Supreme Court, 378 So.2d 916, decided December 13, 1979, our Supreme Court in a criminal case held that the 1976 amendment to La.R.S. 14:2(7) did not effectively change the criminal law of this state to broaden the crime of homicide to include feticide. But be that as it may, the legislature did recognize that life begins at the moment of conception.
I realize, nonetheless, that there is no definition of the word "person" in the civil law of this state that can be applied directly to Article 2315's wrongful death provision. Given this sparse legislative background, I am mindful of Justice Dennis' poignant *1028 statements in a recent case concerning the interpretation of La.C.C. art. 160. In a civilian jurisdiction, said Justice Dennis, civilian judges "may perform extensive exegesis to discover the original legislative intent; legislative texts may be interpreted so as to give them an application that is consistent with the contemporary conditions they are called upon to regulate; and a particular conflict of interests before the court may be resolved in accordance with the general policy considerations which induce legislative action rather than by reliance on logical deductions from the language of the text." Loyacano v. Loyacano, 358 So.2d 304, 308 (La.1978) original hearing. (Emphasis by this court).[11]
In enacting the wrongful death provisions of Article 2315 in 1884, the legislature was ostensibly concerned with the courts' failure to provide a remedy to those persons who suffered most by the death of a loved one. See Hubgh v. New Orleans and Carrollton Railroad Company, 6 La.Ann. 495 (1851). The legislature realized that, above and beyond the injuries suffered by the person who later died of those injuries, an additional and distinct injury was suffered by those family members closest to that person. It was this additional and distinct injury for which the legislature provided a cause of action for recovery in the 1884 amendment to Article 2315.
The purpose of allowing a wrongful death remedy is to help compensate those who are closest to the deceased for the mental anguish, shock, grief, lost wages and lost support they have suffered by the wrongful killing to their loved one. I am willing to concede that in 1884, the legislature's probable prime concern in enacting the wrongful death provision was for widows and orphans who lost the support and services of their husbands and fathers. But the legislature's intent, clearly distinguishable from what may have been the overwhelming social problem at the time, was to provide a distinct action for damages invariably suffered by those closest to the person who was negligently killed. This pervasive intent should apply whether the deceased is a sole wage earner, a homemaker, an elderly grandfather, a newborn babe or an unborn child deprived of life by the negligence of another. The same considerations, to a greater or lesser degree, are present in all cases of wrongful death.
Article 2315 should be interpreted in light of contemporary social and medical conditions. No one will deny the excruciating grief and suffering experienced by a coupleor either one of themwhen the child they are eagerly expecting is killed in the womb by the act of a tortfeasor. Indeed, our courts in a number of instances have awarded damages for this distinct injury and, somewhat ironically, have allowed the wrongful death action to be brought if the child lives but a few moments outside the womb and have allowed the child born alive to sue for its prenatal injuries. Sibley v. Wilcox, 125 So.2d 49 (La.App. 1st Cir. 1960); Moncrieff v. Lacobie, 89 So.2d 471 (La.App. 1st Cir. 1956); Cooper v. Blanck, 39 So.2d 352 (Orl.La.App.1923, reported in 1949); Johnson v. Southern New Orleans Light and Traction Company, Orl.App.No. 9048, writ refused No. 266,433 (1923); Joiner v. Texas and Pacific Railway Company, 128 *1029 La. 1050, 55 So. 670 (1911); Stewart v. Arkansas Southern R. R. Company, 112 La. 764, 36 So. 676 (1904); see also Valence v. Louisiana Power and Light Company, 50 So.2d 847 (Orl.La.App.1959).
Implicit in those decisions which allow an action for prenatal injuries if the child is born alive is the recognition that the child is a "person" at the time it is injured prenatally. This is so because of the language of Article 2315 which relates to offenses and quasi-offenses against a "person." If the unborn child is not a "person" at the time it is injured, then it follows that there can be no action for its prenatal injuries because a "person" has not been injured. Our courts have repudiated any such idea by allowing the child born alive to recover for prenatal injuries. These decisions have recognized, without expressly holding, that the child in the womb is a person for purposes of tort liability. Only by a stretched and strained interpretation of the legal fiction of Article 28 have our courts been able to deny recovery for the wrongful death of a stillborn. Wascom v. American Indemnity Corporation, supra; Youman v. McConnell & McConnell, Inc., supra. Modern medicine is also in accord with the view that an unborn child is a person. Medical authorities stand solidly behind the premise that human life begins at the moment of fertilization.[12] As contemporary conditions stand, both society and the medical profession realize the distinct physical being that is the unborn child in the womb. I need not belabor the point further.
Many jurisdictions across the country which allow wrongful death actions for a stillborn child and actions for prenatal injuries by a live-born child limit the actions to fetuses which are viable, i. e., capable of independent existence outside the womb.[13] Viability has not been the controlling factor in some previous Louisiana cases allowing recovery, and there is no need to make it a controlling factor in this decision. Just as live birth is an arbitrary cutoff point for wrongful death purposes, viability is equally arbitrary in deciding whether the fetus is a "person" whose wrongful killing is compensable. Instead, viability is one of the factors to which courts should look in determining the nature and extent of damages in each particular case.
I come now to the crux of this concurring opinion. Given the fact that the legislature has not defined the word "person" for purposes of Article 2315, should we as civilian judges in a civilian jurisdiction work with the tools the legislature has provided and define "person" to include an unborn child from the moment of fertilization and implantation? I think we should.
One of the main concerns of the defense in this case has been some of the far-fetched consequences that allegedly could result from our decision today. For instance, if a fetus is a person for wrongful death purposes, then does a fetus have an action, typically called a survival action, which it passes on to its Article 2315 successors in the event the fetus does not die instantaneously? Even more interesting and intricate is the question that arises if the mother is killed instantly but the fetus survives for a few minutes before expiring. Does the fetus in such a case have a wrongful death action for the death of its mother and does this action devolve upon its heirs under the express provisions of Article 2315? Further, the defense asks, can a fetus be libeled or slandered while in the womb, and, if so, does its action survive in favor of the designated beneficiaries under Article 2315 in the event of its stillbirth? Finally, the defense raises a question concerning abortion.
My concurring opinion is limited to the holding that the parents of a stillborn whose death results from the negligent or intentional act of another have a right to seek damages for the wrongful death of their inchoate child under Article 2315. *1030 However, from a legal standpoint, this opinion cannot be so limited. If a fetus is a person for wrongful death purposes, it must also be considered a person for other purposes under Article 2315. As a practical matter, and unlike the defense in this case, I do not envision many technical problems arising as a result of this decision. Damages in these cases will be no more difficult to compute than are damages incurred in cases in which the child survives for a few minutes or hours outside the womb. In some cases, damages will be so ephemeral and vague as to be unprovable. However, if damages can be proved, the difficulty in assessing them should not prevent courts from making the proper award. Difficulty in assessing damages has seldom blocked courts from extending tort law to meet modern conditions. And I refuse to let possible damage problems keep us tied to the apron strings of the past.
Even if a fetus, which does not die instantaneously, has a survival action for its own pain and suffering in the womb before stillbirth, the extent of damages will have to be proven. A court will have the same problem in assessing damages as it would if the child lives a short time out of the womb. Proof will be the big problem, and in some cases no damages will be provable at all. See Bell v. Sparrow, 220 So.2d 729, 734 (La.App. 1st Cir. 1969).
The same reasoning would apply in an action brought on behalf of a stillborn for the wrongful death of its mother or father. Damages in this type of case will be hard to prove, but no harder perhaps than damages suffered by a six-month-old child for the wrongful death of its parent or parents when the child dies a few minutes, hours or days after the parent. If damages are proven by a preponderance of the evidence, courts should assess them as they do in any other tort case.
I perceive the case of libel or slander against an unborn as being no different. If the child survives for a few months out of the womb, it has an action for the defamatory statement, but, again, proof of damages will be crucial. Why should there be a difference if the child is stillborn?
Lastly, the defense suggests that if this court classifies a fetus as a "person" then an abortion would be a battery committed upon the fetus, thus creating a cause of action on its behalf. Since this example requires a deeper examination of a woman's constitutional right to have an abortion under certain circumstances, Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and this issue is not directly before us at this time, I pretermit any further discussion.[14]
I think our courts are completely capable of filtering the frivolous cases from the valid ones and of awarding the proper amount of damages when the proper proof has been made. This, indeed, is the ultimate judicial function in tort cases, and our judges have been doing it for years.
I have elaborated the discussion in this area to help placate those who fear that the floodwaters of litigation will flow from the nick the majority has carved in the levee of the law. I do not share this fear. The prime focus of litigation occurring as a result of our opinion today will be for the damages suffered by the parents for the wrongful killing of their unborn child. These damages are certainly more apparent and easier to prove than the damages discussed in the technical hypothetical situations above.[15]
*1031 The anomalies which exist under the present state of the law are reason enough to allow the action sued for here. Under existing jurisprudence, a fetus injured or deformed by the act of a tortfeasor can sue for its prenatal injuries if it emerges from the womb alive. If it lives for 10 days or 10 minutes or even 10 seconds outside the womb, its survivors can sue not only for the fetus' prenatal injuries and post-birth suffering but also for their own damages suffered as a result of the child's wrongful death. But under the law as it stands today, a nine-month-old fetus which emerges stillborn because of a tortfeasor's negligence is considered a nonentity, a nothing, a mass of lifeless matter for which no wrongful death recovery whatsoever is allowed. This anomalous state of affairs, carried on in modern times by the legal fiction of antiquity, can no longer be justified.
Our legislature has given us the tools to allow this action by enacting the wrongful death provisions of Article 2315. Our civilian heritage gives us a solid background for interpreting codal articles in light of contemporary conditions. Our constitutional role as judges commands us to give a fair interpretation of the law in the interest of justice for all. It is with all these considerations in mind that I would decide this most important issue.
And I feel we should decide it on the side of the unborn child.
PONDER, Judge, concurring.
Until the amendment of La.C.C. Art. 2315 in 1884, there was no death action in Louisiana. I think the question becomes whether the legislature in making the amendment intended to, or used terms broad enough, to allow recovery for the death of an unborn child along with all other death actions. I conclude it did.
I therefore concur.
CHIASSON, Judge, concurring.
I concur in this opinion for the reasons assigned by Judge Ellis.
COVINGTON, Judge (dissenting in part and concurring in part):
In the 1977 Wascom[1] decision, cited in the majority opinion, we echoed the sentiment of the trial court that when tortious conduct deprives expectant parents of a child they should have the right to recover. But, we also cited the words of the learned trial judge Burrell J. Carter: "However, this Court does not make the law."
Neither should appellate courts do so. A judicial decision should not be "the law," but rather a learned interpretation of what is "the law." The majority has reached a desired result through the use of a theory of, perhaps, what the law ought to be. However, the law is as it has been enacted by the duly constituted and representative legislative branch of our government.
Sociological decisions may be necessary when the bases of civilian methodology are nebulous. That circumstance does not exist here. A thinly veiled resort to equity is not authorized when the law is clear, C.C. art. 21, no matter how laudable the result.
If article 28 was intended to be applied in a limited manner, i. e., to matters of inheritance, then we must make an unwarranted assumption that the redactors erroneously placed it in the wrong Bookfor, if that was their intention, it should be in Book III, Title I, not Book I, Title I.
The legislature has had almost 100 years, since the adoption of the wrongful death action in 1884, in which to make the codal revision which could have led to a different result in Wascom.
Wascom was a flare or signal, indicating the inequity of existing law. In 1979, there was a lengthy legislative session, but there was no legislation to alter the then current judicial interpretation as enunciated in 1977.
*1032 Our democratic processes allow all persons to influence policy through their legislators. A policy decision, rather than a proper interpretation of the clear language of article 28 and its placement in the code, is a deviation from the constitutional allocation of powers.
The majority is invading the constitutional prerogative of the legislative representatives of the people. Our role is to interpret the law as written, not to invade the province of the legislature and thereby reach a desired philosophical goal.
Therefore, I respectfully dissent from that portion of the judgment which grants the parents damages for the wrongful death of the stillborn child. Otherwise, I concur.
NOTES
[1] This action, Number 33,862 on the Docket of the Seventeenth Judicial District Court, was consolidated for trial with the following actions:

a. Nolan Ougel, Jr. versus Aetna Insurance Company, et al., Number 34,002.
b. Garrison J. Autin, et al. versus Aetna Life & Casualty Insurance Company, Number 35,508.
c. Mr. and Mrs. Edward J. Rousse versus Terry St. Pierre, Number 34,672.
[2] Government Employees Insurance Company was originally named as a defendant (as an insurer of the Malbrough vehicle), but was dismissed on a peremptory exception.
[1] Article 28: "Children born dead are considered as if they had never been born or conceived."

Article 29: "Children in the mother's womb are considered, in whatever relates to themselves, as if they were already born; thus the inheritances which devolve to them before their birth, and which may belong to them, are kept for them, and curators are assigned to take care of their estates for their benefit."
[2] The full title of what I have referred to as the Digest of 1808 is the Digest of the Civil Laws Now in Force in the Territory of Orleans. I will refer to this compilation as the Digest of 1808.
[3] The handwriting is apparently that of L. Moreau Lislet, one of the compilers of the Digest and a well-known lawyer of his time. See, generally, Dainow, "Moreau Lislet's Notes On Sources of Louisiana Civil Code of 1808," 19 La.L.Rev. 43 (1958).
[4] In its entirety Partida Seven, Title 33, Law 8 provides:

"A place surrounded by mountains, or on the shore of the sea where ships or other vessels are loaded or discharge their cargoes is called a harbor. Every other place of this kind where a ship can winter at anchor shall also bear this name, but other places where they can anchor but cannot protect themselves from severe storms, are called roadsteads, or high seas; and in Spain, derived from this term, confined and strong positions on land, situated among great mountains, are called Puertos, or shelters. We also declare that ager, in Latin, means in Castilian, a field which is to be sowed, in which there is no house or other edifice, except some cabin or hut for the purpose of harvesting the crops. The word sylva, properly speaking, is a place where men are accustomed to cut timber for their houses, and firewood. Meadows are fields from which persons obtain profit by cutting hay or grass. Pastures, or places where beasts are supported or kept in winter, are called, in Latin, pascua. Novalios means a mountain, or a cleared tract recently broken up for purposes of cultivation.
"Moreover, we declare that by the word `clothing' is meant all articles of dress, whether belonging to man or woman, which are worn every day, or during the time of repose. An `inheritance' includes the real-estate, personal property, and everything owing to a deceased person, after his debts have been deducted, and any property belonging to others removed.
"We also decree that children who are born dead are not born at all, or reared; and therefore a will made by their father or mother cannot be broken on their account. Moreover, we decree that such as are born in the semblance of animals, or contrary to the usual custom or practice of nature, and are, as it were, monsters, shall not be called children. Matters of this kind we discussed fully in the Title which treats of the Condition of men, which is inserted in the Fourth Partida of this our book."
The Fourth Partida of Las Siete Partidas, to which Law 8 refers, is concerned with domestic relations. The Fourth Partida also contains the source provision of Art. 29. P. 4, T. 23, L. 3.
[5] Las Siete Partidas (Scott Transl.)
[6] Act 71 of 1884.
[7] Professor Ferdinand F. Stone, in his treatise on tort doctrine in Louisiana, advances the argument that the 1884 amendment to Art. 2315 constituted a tacit amendment of Art. 28 so as to allow the wrongful death action for parents of a stillborn. Stone, 12 Louisiana Civil Law Treatise § 63. "It should be pointed out that Article 28 was adopted in 1825 at a time when there was no action for wrongful death and its reference was to the problem in successions. Hence it can be argued that in 1884 when the Code was amended to provide an action for wrongful death, this constituted an amendment of Article 28 to remove the new action from the restriction of the earlier article." Ibid.
[8] Although the Louisiana Supreme Court denied writ applications in Wascom, 350 So.2d 1224 (La.1977), the writ denial is not an adjudication of the merits of the case. Smith v. Division of Administration, 362 So.2d 1101 (La. 1978); see Day, et al. v. Campbell Grosjean Roofing and Sheet Metal Corporation, et al., 260 La. 325, 256 So.2d 105 (1971). While writ denials may be important for a lawyer in determining the future philosophical predilections of the Louisiana Supreme Court, Barham, "The Importance of Writ Denial," 21 Loy.L.Rev. 835 (1975), they are not to be considered a precise statement of the law in a given case.
[9] Art. 2315 provides in full:

"Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
"The right to recover damages to property caused by an offense or quasi offense is a property right which, on the death of the obligee, is inherited by his legal, instituted, or irregular heirs, subject to the community rights of the surviving spouse.
"The right to recover all other damages caused by an offense or quasi offense, if the injured person dies, shall survive for a period of one year from the death of the deceased in favor of: (1) the surviving spouse and child or children of the deceased, or either such spouse or such child or children; (2) the surviving father and mother of the deceased, or either of them, if he left no spouse or child surviving; and (3) the surviving brothers and sisters of the deceased, or any of them, if he left no spouse, child or parent surviving. The survivors in whose favor this right of action survives may also recover the damages which they sustained through the wrongful death of the deceased. A right to recover damages under the provisions of this paragraph is a property right which, on the death of the survivor in whose favor the right of action survived, is inherited by his legal, instituted, or irregular heirs, whether suit has been instituted thereon by the survivor or not.
"As used, in this article, the words `child', `brother', `sister', `father', and `mother' include a child, brother, sister, father, and mother, by adoption, respectively."
[10] La.R.S. 2:1; 3:72; 3:551.1; 3:555.2; 3:555.3; 3:1622; 5:4; 6:1032; 9:1725; 9:2431; 9:4751; 10:1-201; 10:8-308; 12:402; 12:443; 17:1224; 17:2803; 22:5; 30:3; 30:904; 30:1003; 32:1252; 33:2711.3; 33:4625; 34:801; 34:850.2; 34:851.2; 37:1963; 37:2352; 37:2582; 38:3101; 38:3073; 39:1484; 40:1299.39; 40:1471.2; 40:2009.2; 40:2102; 40:2202; 41:1704; 42:1111; 45:162; 45:200.2; 47:7; 47:301(8); 47:801; 49:213.3; 49:951; 51:911.22; 51:1053; 51:1101; and La. Code Crim.Proc. Art. 934.
[11] Justice Dennis cites a number of doctrinal sources for his statements concerning interpretation of the law in Louisiana. Among them is former Justice Tate's comment entitled, "Techniques of Judicial Interpretation in Louisiana," 22 La.L.Rev. 727 (1962). Justice Tate's comment recognizes the objective and the functional methods of statutory interpretation. These methods "place great emphasis upon applying the legislation so as to carry out the general social purpose of the legislation. This calls for consideration of the general policy reasons underlying the enactment of the legal precept the general purpose behind its enactment to regulate in the abstract a certain conflict of interest, and the practical or equitable reasons for this purpose." 22 La.L.Rev. at 733. Justice Tate also recognizes that in the field of tort law, unlike the field of property law and other areas of law in which inflexibility and unchanging rules are required because of the reliance persons place upon them, more flexibility is required, "since there the legal precepts revolve about reasonable standards of conduct, which themselves are evolving and changing as the circumstances of the society which spawns them change." 22 La.L.Rev. at 748.
[12] Prosser, Torts § 55 (4th ed. 1971). Dean Prosser cites Herzog, Medical Jurisprudence, 1931, §§ 860-975; and Malloy, Legal Anatomy and Surgery, 1930, 669-687.
[13] For a collection of authorities, see 84 A.L. R.3d 432. Dean Prosser also discusses the viability problem. Prosser, Torts § 55 (4th ed. 1971).
[14] It could be argued that since a wrongful death action is grounded on the defendant's tortious conduct, and that a woman's right of privacy entitles her to end her pregnancy at certain stages, the abortion is not tortious as to the fetus.
[15] In awarding damages for the wrongful death of a stillborn, a trial judge can look to a number of factors to determine the extent of damages suffered by the parents. Some of the factors are: 1. the stage of pregnancy at which the stillbirth occurs; 2. the medical history of the mother with respect to previous childbirths; 3. the number of children the couple presently has; 4. whether the mother used artificial means to induce pregnancy, i. e., fertility drugs; 5. the probability of pregnancy going to full term; 6. any prior history of miscarriage; 7. prenatal care of the stillborn child; 8. parental preparation for the forthcoming child, i. e., house additions, baby crib and any other indicia of the degree of expectation exuded by the parents.
[1] Wascom v. American Indemnity Corporation, 348 So.2d 128 (La.App. 1 Cir. 1977), writ refused, 350 So.2d 1224 (La.1977).