Linda WEITL, Gregory B. Weitl, and Roberta Bennett, Robert Bennett, Jr., & Gregory E. Weitl, Jr., by their mother and next friend, Linda Weitl, and Gregory Weitl as Administrator of the Estate of Kelly Weitl, Appellants,

v.

John R. MOES, John Ramsey, Albert M. Dolan and St. Francis Hospital of Franciscan Sisters, Appellees.

No. 64843.

Supreme Court of Iowa.

Oct. 21, 1981.

Jim D. DeKoster of Swisher & Cohrt, Waterloo, and Timothy S. White, Cedar Rapids, for appellants.

William M. Tucker and Richard M. Tucker of Phelan, Tucker, Boyle & Mullen, Iowa City, Walter C. Schroeder of Winston, Schroeder & Reuben, Mason City, Edward J. Gallagher, Jr., of Gallagher, Langlas & Gallagher, P. C., Waterloo, and James E. Walsh, Jr., of Clark, Butler & Walsh, Waterloo, for appellees.

Nick Critelli of Critelli & Foxhoven, P. C., Des Moines, for amicus curiae Association of Trial Lawyers of Iowa.

ALLBEE, Justice.

Two important questions are presented by this appeal: (1) whether a child may maintain an action for loss of parental society and companionship when the parent is injured by the tortious act of a third party, and (2) whether a wrongful death action lies in behalf of a fetus which is stillborn due to a tortious injury to the mother. Trial court, in recognition of prior precedent, found that neither cause of action is cognizable in Iowa, and accordingly dismissed two counts of plaintiffs' petition. We affirm the dismissal of the wrongful death claim, but reinstate the action for loss of parental society and companionship.

The allegations of plaintiffs' petition, which we accept as true for purposes of this appeal, may be summarized as follows. Linda Weitl, a mother of three children, was in the late stages of a pregnancy when she was treated for bronchitis and hyperventilation at defendant hospital in November 1977. As a result of improper diagnosis and treatment by defendant doctors and hospital, Linda experienced respiratory and cardiac arrest. This incident produced severe, permanent brain damage and permanent blindness in Linda, and also caused her fetus to be stillborn. The fetus, which has been given the name Kelly, was very nearly full term and was capable of being born alive at the time of the incident which produced Linda's injury.

In Count I of plaintiffs' petition, Linda seeks damages for her own injuries and for loss of her services and support to her children and husband. Her husband, Gregory Weitl, asks for damages for loss of consortium and for Linda's medical expenses in Count II. Defendants did not request dismissal of those counts.

Linda's three minor children seek recovery in Count III for "loss of family relationship, loss of companionship and association, the care, attention, kindness, maternal guidance, comfort and solace of their mother's society." On behalf of the fetus's purported estate, Gregory sues in Count IV for the wrongful death of the stillborn fetus. On motion of some defendants, trial court dismissed Counts III and IV. This appeal followed.

## I. Appellate jurisdiction.

Before considering the merits of this appeal, we must address a jurisdictional issue. There being some question as to whether this appeal is from a final judgment, as required by Iowa R.App.P. 1(a), we asked the parties to submit briefs on that issue.

■ The parties argue opposing views as to the finality of trial court's order dismissing two of four counts of the petition. See Iowa R.App.P. 1(a) and (b). But even assuming that the order was not a final judgment, we have determined that we may, and should, grant an appeal in this case pursuant to Iowa R.App.P. 1(c). That rule permits us to treat the papers upon which the appeal is taken as the equivalent of an application for interlocutory appeal under Iowa R.App.P. 2. Rule 2, in turn, allows us to entertain an appeal from an interlocutory ruling upon finding that the ruling "involves substantial rights and will materially affect the final decision and that a determination of its correctness before trial on the merits will better serve the interests of justice." We find that those criteria are met in the present case.

## II. Child's action for loss of parental consortium.

### A.

As stated at the outset, the first important issue presented by this appeal is whether this court should recognize an independent right of action in a child to recover for the loss of society and companionship of a parent who has been tortiously injured by a third party. Before addressing the parties' specific arguments, it will be helpful to examine the background and current status of this asserted cause of action in Iowa and elsewhere.

Until recently, a child's cause of action for loss of parental consortium was unknown to the common law. See Hankins v. Derby, 211 N.W.2d 581, 582 (Iowa 1973). Within the last two years, however, two

jurisdictions have recognized such a cause of action. *See Ferriter v. Daniel O'Connell's Sons, Inc.,* —— Mass. ——, 413 N.E.2d 690 (1980); *Berger v. Weber*, 411 Mich. 1, 303 N.W.2d 424 (1981). All other jurisdictions which have considered the issue have declined to so extend the common law. *See generally* Annot., 69 A.L.R.3d 528 (1976 & Supp.1981).

In *Hankins v. Derby*, this court similarly declined to recognize such an independent cause of action in the child. 211 N.W.2d at 585–86. While acknowledging the importance of a child's interest in maintaining viable family relationships, and conceding that the asserted cause of action carried "great emotional appeal," the *Hankins* majority declared that recognition of the child's right of recovery was more properly an issue for legislative determination. 211 N.W.2d at 582, 585. In addition, the court stated that it was "inhibited" from recognizing such a cause of action by section 613.15, The Code 1971. 211 N.W.2d at 585. That statute, which remains unchanged in the current Code, provides:

**Injury or death of spouse—measure of recovery.** In any action for damages because of the wrongful or negligent injury or death of a woman, there shall be no disabilities or restrictions, and recovery may be had on account thereof in the same manner as in cases of damage because of the wrongful or negligent injury or death of a man. In addition she, or her administrator for her estate, may recover for physician's services, nursing and hospital expense, and in the case of both women and men, such person, or the appropriate administrator, may recover the value of services and support as spouse or parent, or both, as the case may be, in such sum as the jury deems proper; provided, however, recovery for these elements of damage may not be had by the spouse and children, as such, of any person who, or whose administrator, is entitled to recover same.

The *Hankins* majority concluded that the quoted statutory provision "clearly permits recovery for all of the elements of damages asserted by plaintiff"[1] and that "[i]t limits procedurally only the manner in which and the proper party by whom, the cause of action may be maintained...." 211 N.W.2d at 586. Thus, *Hankins* in fact determined that section 613.15 provided a statutory means of recovering damages for a child's loss of parental consortium, but also held that, by operation of the statute, any claim for such damages on the child's behalf must be brought by the injured parent or his estate.

### B.

Plaintiffs advance two principal arguments in support of their contention that trial court erred in dismissing the claim of Linda's children for loss of parental consortium. First, they urge that section 613.15, as interpreted in *Hankins*, be declared unconstitutional. Plaintiffs assert that the statute as interpreted violates the Equal Protection Clause of the fourteenth amendment by denying a child's independent cause of action for parental consortium, while Iowa law otherwise permits a parent's separate action for loss of a child's consortium, *see* Iowa R.Civ.P. 8, as well as an independent action for loss of spousal consortium, *see Fuller v. Buhrow*, 292 N.W.2d 672, 674–76 (Iowa 1980); *Acuff v. Schmit*, 248 Iowa 272, 78 N.W.2d 480 (1956). Alternatively, plaintiffs ask this court to abandon the *Hankins* interpretation of section 613.15 and to recognize a common law cause of action by a child for loss of parental consortium due to the tortious injury of his parent.

Because plaintiffs challenge the constitutionality of section 613.15 as interpreted in *Hankins*, it is necessary to reexamine that decision to determine whether it correctly

---

1. Significantly, the elements of damage pleaded by Linda's children in the case at bar are worded identically to those asserted by the child plaintiff in *Hankins. See Hankins*, 211 N.W.2d at 581–82.

At this juncture, we also note that the three dissenters in *Hankins* specifically stated that they disagreed with the majority's determination that section 613.15 permitted recovery for those elements of damage. 211 N.W.2d at 589.

interpreted the statute to bar a child's independent recovery for loss of parental consortium. We note that the perceived "inhibiting" effect of section 613.15 was not the sole basis for the *Hankins* decision, and that no constitutional challenge to the statute was presented in that case. Thus, a closer examination of the *Hankins* interpretation of section 613.15 is appropriate at this time.

We find that several difficulties inhere in the *Hankins* view of the statute. First, section 613.15 provides that the injured person "may recover the value of services and support as *spouse or parent*, or both," and that "recovery for these elements of damage may not be had by the *spouse and children*, as such, of any person who ... is entitled to recover same." (Emphasis added.) Because the statute is worded so as to apply equally to spouses and children, it must bar a spouse's independent action for consortium if it indeed bars the child's action. However, independent claims for spousal consortium are regularly brought in Iowa by the noninjured spouse, as evidenced even by Gregory's claim in the case at bar. *See, e. g., Fuller,* 292 N.W.2d at 674–76; *Acuff,* 248 Iowa 272, 78 N.W.2d 480. It has never been held that section 613.15 bars those claims.

A second difficulty is that even though *Hankins* states that section 613.15 covers "all of the elements of damages asserted by plaintiff" in that case—i. e., loss of companionship, society, care, attention, kindness, guidance, comfort and solace—the only elements of damage mentioned in the statute itself are medical expenses and the "value of services and support as spouse or parent, or both." Because "support" refers to financial maintenance and the providing of material comforts, the *Hankins* court apparently construed the word "services" to include the intangible elements of damage pleaded in that case. In this respect, *Hankins* is buttressed by *Iowa-Des Moines National Bank v. Schwerman Trucking Co.,* 288 N.W.2d 198, 204 (Iowa 1980), in which this court said:

In the context of parent-child relationships, we find no reason to assume the legislature intended loss of "services" as used in section 613.15, The Code, to have a different meaning from loss of "services" in former Iowa R.Civ.P. 8. We construed the latter provision to include loss of companionship and society.

(Citations omitted.) Also, in *Schmitt v. Jenkins Truck Lines, Inc.,* 170 N.W.2d 632, 664–65 (Iowa 1969), four members of an equally divided court apparently viewed parental "affection" and "guidance" as part of the "services" referred to in section 613.-15.

A contrary view of the statute was, however, expressed by this court in *Fuller,* cited earlier. In that case, we observed that consortium damages in Iowa "are limited to compensation for the loss of such intangible elements as company, cooperation, affection and aid" and that these are to be distinguished from the tangible elements—medical expenses, services and support—covered by section 613.15. *Fuller,* 292 N.W.2d at 675. *Fuller,* in turn, is supported by *Acuff,* 248 Iowa at 274, 78 N.W.2d at 481–82, where this court made a similar statement and noted that the value of services is not included in a spousal consortium claim in Iowa.

Thus, two lines of cases have emerged, one construing "services" in section 613.15 to include intangible elements of damage in the context of a child's loss of parental consortium, and the other construing the same word in the same statute to exclude such intangible elements when the claim is for a spouse's loss of consortium. Because the statute cannot have two meanings, depending on the party to whom it is applied, we must determine which meaning was intended by the legislature.

C.

■ Research convinces us that the word "services" in section 613.15 was not meant by the legislature to include society, companionship or any of the related intangible elements of damage which comprise a consortium claim in Iowa.

The earliest version of section 613.15 to appear in the Iowa statutes was enacted in 1911. *See* 1911 Sess., 34th G.A., ch. 163, § 1. Prior to that time, a husband's independent cause of action for loss of the society of his wife had become firmly established as a part of Iowa's common law. *See Mowry v. Chaney*, 43 Iowa 609, 611 (1876) (husband, suing in own right and not as administrator of wife's estate, could recover for loss of her society during period between injury and death); *McKinney v. Western Stage Co.*, 4 Iowa 420, 424 (1857) ("husband might maintain his separate action for any loss sustained by him in consequence of being deprived of the society of the [negligently injured] wife"); Note, *Loss of Consortium in Iowa*, 10 Drake L.Rev. 33, 36 (1960).

Under the law prior to 1911, the estate of a woman who did not have an income of her own would be able to recover little or nothing for her wrongful death. This was because such damages were measured, for both men and women, by the present value of the estate the decedent would have accumulated but for the untimely death. *See* Druker, *The Question of Damages Resulting From Recent Legislative Changes*, 15 Drake L.Rev. 107, 108–09 (1966). Presumably to remedy this situation, the legislature in 1911 enacted the forerunner of section 613.15, which allowed a jury, for the first time, to consider the value of a woman's "services as a wife or mother" in making a wrongful death award. *See* 1911 Sess., 34th G.A., ch. 163, § 1. A successor statute, passed in 1941, allowed the value of an injured woman's services to be considered also in cases where her injury did not result in death. *See* 1941 Sess., 49th G.A., ch. 297, § 1; § 613.11, The Code 1946.

In 1916, only five years after the initial statute allowing recovery for the value of a woman's "services" was enacted, this court apparently found the statute inapplicable to a claim for loss of a spouse's society. *Lane v. Steiniger*, 174 Iowa 317, 318–19, 156 N.W. 375, 376 (1916). *But see Jacobson v. Fullerton*, 181 Iowa 1195, 1201–02, 165 N.W. 358, 359–60 (1917). Because the deceased wife in *Lane* had survived for some period between injury and death, the court stated

that "the husband might have maintained an action for loss of his wife's society." *Lane*, 174 Iowa at 318, 156 N.W. at 376. The court acknowledged, however, that he could not have maintained an action for loss of her services, because the 1911 statute placed that right of action exclusively in the hands of the administrator of her estate. *Id.* at 319, 156 N.W. at 376.

The 1941 version of the statute was similarly interpreted in *DeMoss v. Walker*, 242 Iowa 911, 48 N.W.2d 811 (1951), where an estate administrator sought recovery for loss of the seventy-seven-year-old decedent's services as a mother. The court noted that "services" as used in the statute referred to a woman's menial household labor and her services as "administrator of the internal affairs of her home." *Id.* at 914, 48 N.W.2d at 813. The court denied recovery for loss of the woman's services only because there was no evidence that she regularly provided any such services to her children, all of whom were adults living in their own homes. *Id.* Furthermore, even though the woman's death terminated her relationship with her children and thus resulted in their loss of her companionship, the court observed that damages for "loss of society" were not recoverable under the statute. *Id.* at 915, 48 N.W.2d at 814. *See also Medd v. Westcott*, 32 F.R.D. 25, 27–28 (N.D.Iowa 1963) (Iowa cases appear to indicate that man whose wife survived for four months before dying of injuries had "independent action not eliminated by § 613.11 [the immediate predecessor of section 613.-15]" for loss of wife's " 'love and affection, society, companionship and consortium' " during those months, but that he could not claim damages for loss of her aid and services); *Acuff*, 248 Iowa at 276, 78 N.W.2d at 483 (right to bring independent action for loss of consortium "clearly existed at common law so far as the husband was concerned, and we find no statute which deprives him of the same."); Druker, *supra*, at 112 (Iowa court has long held that loss of "services" in section 613.15 and its predecessors refers to "a pecuniary loss and not one based on a consideration of . . . loss of society and companionship.").

The foregoing authorities, along with *Fuller* and *Acuff*, demonstrate that this court's original and more consistent construction of "services" in section 613.15 and its predecessors has been that it applies only to the tangible services of a spouse or parent. In the four times the statute has been amended or superseded,[2] the legislature has not once indicated that this longstanding construction was incorrect. Therefore, we hold that the legislature did not intend section 613.15 to apply to claims for loss of society, companionship and the other intangible elements that come under the rubric of "consortium" in Iowa. To the extent our prior cases are inconsistent with this holding, they are overruled. Our resolution of this question makes it unnecessary to consider appellants' constitutional challenge to section 613.15.

### D.

Having determined that section 613.15 has no inhibiting effect upon our decision, it remains for us to decide whether we should recognize an independent action by a child for loss of parental consortium due to a third party's tortious injury of the parent.

Our analysis must take into account the existence of related causes of action under Iowa law. As noted, a married person in Iowa may maintain an independent action for loss of consortium of an injured spouse. In addition, a parent may sue for "loss of services, companionship and society resulting from injury to or death of a minor child." Iowa R.Civ.P. 8. Plaintiffs argue that logic and fairness demand extension of a similar right of recovery to the child.

Before examining that argument, we find it beneficial to review the evolution of rule 8. The rule was originally an 1860 statute under which a parent was allowed to recover "the expenses and actual loss of service" resulting from wrongful injury or death of

his minor child. § 2792, The Code, Revision of 1860. This statute may have been based on the common law rule that a father was entitled to the wages earned by a minor child and to the economic value of his services. *See Pawnee Farmers' Elevator Co. v. Powell*, 76 Colo. 1, 7, 227 P. 836, 839 (1924); *Meredith v. Buster*, 209 Ky. 623, 625, 273 S.W. 454, 454 (1925); *Stewart v. City of Ripon*, 38 Wis. 584, 588 (1875). In 1943, the framers of the Iowa Rules of Civil Procedure decided to make the statute a part of the rules. *See* 1943 Sess., 50th G.A., ch. 278, at 288.

Eventually, this court in a 5–4 decision construed the term "services" in rule 8 to include "companionship and society." *Wardlow v. City of Keokuk*, 190 N.W.2d 439, 448 (Iowa 1971). Any debate over that construction would now be moot, because two years after the *Wardlow* decision rule 8 was amended to explicitly include "companionship and society." *See* 1973 Sess., 65th G.A., ch. 316, at 660, 676–78.

The existence of a parent's independent action for loss of consortium under rule 8 presents certain problems. While a spousal consortium claim may possibly be distinguished from a child's claim for loss of parental consortium on a number of grounds, *see, e. g., Borer v. American Airlines, Inc.*, 19 Cal.3d 441, 448, 138 Cal.Rptr. 302, 307, 563 P.2d 858, 863 (1977); *Russell v. Salem Transportation Co.*, 61 N.J. 502, 505–06, 295 A.2d 862, 863–64 (1972), a parent's claim for loss of the child's consortium appears to be more difficult to distinguish. In a recent case, the California Supreme Court stated that it was "[u]npersuaded of any legal distinction between a parent's claim for loss of a child's consortium and a child's claim for loss of a parent's consortium." *Borer*, 19 Cal.3d at 444, 138 Cal.Rptr. at 304, 563 P.2d at 860. There being no equivalent of our rule 8 under California law,[3] the

2. For a discussion of these legislative changes, *see generally* Druker, *supra*, at 108–09.

3. Only two jurisdictions other than Iowa have statutes allowing the parent of an injured child to recover for loss of the child's society and companionship. *See Hayward v. Yost*, 72 Idaho 415, 425, 242 P.2d 971, 977 (1952) (construing Idaho Code §§ 5–310 to –311); Wash.Rev. Code Ann. § 4.24.010 (Supp.1981). Apparently, Wisconsin is the only state in which the highest court has explicitly recognized such a common law action in the parent. *See Shockley v. Prier*, 66 Wis.2d 394, 225 N.W.2d 495

court then proceeded to deny both the child's cause of action in *Borer* and the parent's cause of action in a companion case, *Baxter v. Superior Court of Los Angeles County*, 19 Cal.3d 461, 138 Cal.Rptr. 315, 563 P.2d 871 (1977). Given the existence of rule 8, the first question we must face is whether the policy considerations which other courts have viewed as weighing against recognition of the child's cause of action remain persuasive in a jurisdiction which has already recognized the parent's cause of action.

### E.

A number of the reasons traditionally given for rejecting the child's cause of action are not convincing, even in the absence of a parental right of recovery. The argument that no precedent exists, if ever a worthy reason for denying recovery, is no longer valid in light of *Ferriter* and *Berger*. The contention that recognition of such a cause of action is a question for the legislature ignores the fact that the action for loss of consortium is a creation of the common law, and that the development of the common law is within the proper sphere of our authority and responsibility. We observe that this court did not await legislative action to abrogate the common law rule which prevented a wife from suing for loss of spousal consortium. *See Acuff*, 248 Iowa 272, 78 N.W.2d 480. Also without merit is the "floodgates" argument that recognition of the child's right of action will force the court to recognize similar claims by siblings, grandparents, other relatives or friends. We believe a court should have no trouble limiting the cause of action to the two relationships, husband-wife and parent-child, in which the loss suffered is likely to be greatest. *See Berger v. Weber*, 82 Mich. App. 199, 210, 267 N.W.2d 124, 129 (1978), *aff'd*, 411 Mich. 1, 303 N.W.2d 424 (1981).

It has further been argued that the child's cause of action should be denied because it would lead defendants to attack the quality of the parent-child relationship in order to contest the issue of damages; because the damages would be remote and uncertain; and because it would be anomalous to protect against negligent interference with a child's interest in parental companionship when Iowa law does not protect that interest from intentional interference by way of an alienation of affections action. *See Wheeler v. Luhman*, 305 N.W.2d 466 (Iowa 1981). In addition, the inability of money to compensate for intangible losses has been cited as a reason for denying recovery. *Borer*, 19 Cal.3d at 447, 138 Cal. Rptr. at 306, 563 P.2d at 862.

In the context of Iowa law, we are unpersuaded by these arguments, because they carry no greater weight in relation to a child's claim than they would in relation to a parent's or spouse's claim. There would be no greater incentive for a defendant to attack the quality of the underlying relationship in the case of a child's claim than there is in the case of a parent's or spouse's claim, and yet that possibility has not deterred us from recognizing either of the latter claims. The uncertainty and remoteness of damages and the incompensability of the loss are present in the parent's claim for loss of a child's consortium no less than they would be in the converse situation, and yet rule 8 allows the parent's claim. Finally, we protect a spouse against negligent interference with the marital relationship even though we do not recognize a cause of action for intentional alienation of spousal affections. *See Fundermann v. Mickelson*, 304 N.W.2d 790 (Iowa 1981). We find no anomaly here. The distinction is not between intentional and negligent torts; there is no reason why a person could not recover for loss of consortium resulting from an intentional physical or mental injury to his or her spouse. Rather, we deny recovery when the consortium is lost because the spouse *voluntarily abandons* the marital relationship, with the encouragement of a third party, but we allow recov-

(1975). *See generally* Love, *Tortious Interference With the Parent-Child Relationship: Loss of an Injured Person's Society and Companion-* ship, 51 Ind.L.J. 590, 592 n.4 (1976); Annot., 69 A.L.R.3d 553 (1976).

ery when the consortium is lost because the spouse is *involuntarily injured* by a third party. A similar distinction would apply in the context of a child's claim for loss of parental consortium.

As further reason for denying the child's cause of action, defendants point out that the common law gives a child no enforceable claim against his parent for anything other than basic support. They argue that recognition of a child's "right" to parental society, companionship and training would require courts to allow children to sue their parents for negligently or willfully failing to provide those elements in the parent-child relationship. This argument also lacks merit. First, we observe that the existence of spousal and parental consortium claims in Iowa has not opened the door to damage suits by persons whose spouses or children fail or refuse to provide adequate companionship. Second, it is not necessary that an interest be based on a legally enforceable entitlement in order to be compensable in damages, *Schmitt*, 170 N.W.2d at 664; one need only show that there was a reasonable certainty of receiving benefits with which the tortfeasor unreasonably interfered. *See Frohwein v. Haesemeyer*, 264 N.W.2d 792, 795 (Iowa 1978) (recognizing cause of action for wrongful interference with a bequest); *McPeek v. Western Union Telegraph Co.*, 107 Iowa 356, 362–63, 78 N.W. 63, 65 (1899) (holding defendant liable for negligently causing plaintiff to lose chance of winning reward); Note, *The Child's Right to Sue for Loss of a Parent's Love, Care and Companionship Caused by Tortious Injury to the Parent*, 56 B.U.L. Rev. 722, 730–31 (1976). This principle is inherent in rule 8, for a parent has no more legal entitlement to his child's society and companionship than does a child to that of his parent.

### F.

Another group of concerns is based on what we perceive as a valid distinction between the parent's claim and the child's claim: An injured child has only two parents, but an injured parent may have any number of children. *See, e. g., Borer*, 19 Cal.3d at 445, 138 Cal.Rptr. at 305, 563 P.2d at 861 (injured woman's nine children sued for loss of her consortium). Thus, defendants argue, recognition of a cause of action for parental consortium would expose tortfeasors to a "substantial accretion of liability ... arising out of a single transaction." It is also contended that this increase in potential liability would be a cost ultimately borne by society as a whole, both through higher insurance premiums and as a result of a rise in the number of uninsured tortfeasors. *See Borer*, 19 Cal.3d at 447, 138 Cal.Rptr. at 306, 563 P.2d at 862; *Russell*, 61 N.J. at 506, 295 A.2d at 864.

While these arguments are persuasive when viewed in the abstract, they lose force in light of the fact that parental consortium damages have heretofore been available in Iowa under section 613.15, as interpreted in *Hankins*. Under that interpretation of the statute, which we today reject, a tortfeasor could be held liable for the loss of parental consortium suffered by his victim's children, *see Schwerman*, 288 N.W.2d at 204, even though the claim could be pursued only by the injured parent or by a deceased parent's estate. Plainly, the tortfeasor's potential liability is the same, regardless of who brings the claim. Thus, in practical effect, our recognition of a child's independent action for loss of parental consortium would not increase a tortfeasor's potential liability; in fact, a refusal to recognize such an action at this time would result in a restriction of that liability, because our rejection of the *Hankins* interpretation means section 613.-15 is no longer available as a means of recovering parental consortium damages.

Perhaps the principal difficulties with recognizing an independent consortium action in a child, as opposed to an action that may be pursued only by the injured parent, are procedural and administrative. Certain problems arise from the fact that, because each child of an injured parent would have an independent right of action, a multiplicity of litigation could result from a single incident. While the same may be said of a parent's independent claim under rule 8, the

fact is that parents are more likely to join their rule 8 claims with the injured child's claims since the parents are usually in control of the child's lawsuit. Because a minor child is never in control of his injured parent's lawsuit, the possibility of separate lawsuits brought at different points in time is increased. This is particularly so because of section 614.8, The Code, which provides that the limitations period on a minor child's claim cannot expire before he reaches nineteen.

Possible consequences of this potential multiplicity of suits include an increase in litigation costs, additional burdens on an already-crowded court system and the possibility that settlements with injured parents will be discouraged because the children's independent claims would not be extinguished. Arguably, there is also a possibility that damages awarded to the child in a subsequent independent suit may overlap with those already awarded to the parent, because the jury in the parent's case may have enlarged its award somewhat to compensate for the loss of companionship suffered by the children.

A possible solution to these problems would be a requirement of compulsory joinder of the child's consortium claim with his injured parent's claims. *See* Love, *supra*, at 626–28; 56 B.U.L.Rev., *supra*, at 732–33. Other courts have recognized new causes of action for loss of consortium on the condition that such claims be joined with those of the primary tort victim. *See Shockley v. Prier*, 66 Wis.2d 394, 404, 225 N.W.2d 495, 501 (1975) (parent may maintain action for loss of child's consortium "provided, and on condition, that the parent's cause of action is combined with that of the child for the child's personal injuries."); *Ekalo v. Constructive Service Corp. of America*, 46 N.J. 82, 92, 215 A.2d 1, 6 (1965) ("In recognizing a wife's claim for loss of consortium, we may, of course, condition it upon joinder with her husband's claim. . . ."). The alternative would be to require joinder whenever feasible, without making the joinder requirement absolute. *See Diaz v. Eli Lilly and Co.*, 364 Mass. 153, 162–63, 302 N.E.2d 555, 560–61 (1973); *Fitzgerald v. Meissner & Hicks, Inc.*, 38 Wis.2d 571, 580–82, 157 N.W.2d 595, 599–600 (1968).

Even in the absence of joinder, the potential problem of overlapping recovery may be solved by jury instructions which make it clear that damages for the children's loss of society and companionship are not to be included in the injured parent's award and that the children are entitled to pursue an independent claim for such recovery. If the jury is made aware that the children have their own action, it will not perceive the need to compensate their loss in the parent's suit. 56 B.U.L.Rev., *supra*, at 735–36. Where both parent and child join in one suit, such instructions would provide the additional benefit noted in *Berger*, 82 Mich. App. at 210, 267 N.W.2d at 129: "Rather than having juries make blind calculations of the child's loss in determining an award to the parent, a child's loss could be openly argued in court and the jury could be instructed to consider the child's loss separately."

Finally, even where the parent's and children's claims are joined in one action, there is the problem of finding an equitable way to apportion damage awards among the various children. Ideally, awards would be allocated in proportion to the value of society and companionship that each child lost, which may be greater for some children than for others. However, this would create serious proof problems and might tend to produce family disharmony. Love, *supra*, at 624–26. Thus, an equal apportionment of the award may ultimately be deemed preferable.

## G.

Having examined the possible drawbacks, we turn to considerations weighing in favor of recognizing a child's independent action for loss of consortium.

First, we note that there has been a growing trend to recognize minor children as having independent identities and possessing certain rights of their own. *See, e. g., Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52

L.Ed.2d 675 (1977); *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); 56 B.U.L.Rev., *supra*, at 742–43. Recognition of a child's cause of action for loss of parental consortium would be in keeping with that trend. Moreover, unless sound reasons exist for disparity in treatment, children ought to be accorded the same protection and the same legal redress for wrongs done them as adults enjoy. *See* 56 B.U.L.Rev., *supra*, at 742.

In addition, to recognize a right of recovery for a parent's loss of a child's consortium, and not for a child's loss of a parent's consortium, runs counter to the fact that in any disruption of the parent-child relationship, it is probably the child who suffers most:

> Since the child in his formative years requires emotional nurture to develop properly, the loss of love, care and companionship is likely to have a more severe effect on him than on an adult; and society has a strong interest in seeing that the child's emotional development proceeds along healthy lines. Moreover, an adult is in a better position than a child to adjust to the loss of a family member's love, care and companionship through his own resources. He is capable of developing new relationships in the hope of replacing some of the emotional warmth of which he has been deprived. A child, however, is relatively powerless to initiate new relationships that might mitigate the effect of his deprivation. Legal redress may be the child's only means of mitigating the effect of his loss.

56 B.U.L.Rev., *supra*, at 742. *See also* Comment, *The Child's Cause of Action for Loss of Consortium*, 5 U.San.Fern.V.L.Rev. 449, 467–68 (1977). Although damages can never replace a parent's companionship, comfort, affection and guidance, they can help compensate for the effects of those losses in a number of ways, as will be demonstrated in our subsequent discussion.

Also weighing in favor of recognizing the child's cause of action is the fact that the more drastic change in our law would result not from recognition of the claim, but from its denial. As noted earlier, under the *Hankins* decision, damages for loss of parental consortium have been available in Iowa by way of section 613.15. Now that we have rejected that statute as a vehicle for the injured parent to recover those damages on the child's behalf, denial of the child's cause of action would leave a family with no means of seeking redress for the child's intangible, but very real, losses.

The present case provides an example of the consequences of such a denial. Allegedly because of defendants' negligence, Linda Weitl is now blind and severely brain damaged. Both conditions are permanent. As a result, her three children are likely to be totally deprived of any meaningful relationship with her. While Linda may seek damages on their behalf for loss of her "services" as a parent, such damages would provide only for tangible parental services such as cooking, laundering, keeping the children clean and safe, and transporting them to appointments and activities. On the other hand, Linda's husband may find that he needs to employ a person who can enter into a personal relationship with the children and provide them with companionship and guidance; he may need to curtail his working hours, and thus his income, in order to spend more time with the children himself; he may eventually find one or more of the children to be in need of counseling for emotional problems arising from the loss of maternal companionship and guidance. Yet none of these compensatory measures may be possible if the children are denied recovery for loss of their mother's society and companionship.

Finally, we believe there would be merit in requiring that damages for loss of parental consortium be awarded separately to the child, rather than to the injured parent as required by *Hankins*. Such a separate allocation helps ensure that the money will actually be used to benefit the child whose loss it is intended to compensate, rather than being used for some other purpose by the parent.

### H.

In the final analysis, we conclude that the reasons for recognizing a child's cause of action for loss of parental consortium in Iowa outweigh any problems such an action may present. Accordingly, we hold that a minor has an independent cause of action for loss of the society and companionship of a parent who is tortiously injured by a third party so as to cause a significant disruption or diminution of the parent-child relationship.

We limit damages under this cause of action to the period of the child's minority, even though we recognize that adult children may also benefit from their parent's society and companionship. We do so because minors are the group most likely to suffer real harm due to a disruption of the parent-child relationship.[4] In addition, such a requirement provides parity with rule 8, which limits the parent's consortium damages to the period of the child's minority.

Lastly, because of the multiplicity of litigation that could otherwise result when an injured parent has a number of children, we condition our recognition of the child's cause of action on a requirement that the child's claim be joined with his injured parent's claims whenever feasible. If a child's consortium claim is brought separately, the burden will be on the child plaintiff to show why joinder was not feasible.

### III. *Wrongful death of a fetus.*

The other important question we consider on this appeal is whether this court's decision in *McKillip v. Zimmerman*, 191 N.W.2d 706 (Iowa 1971), should be overruled. *McKillip* held that no wrongful death action may be maintained on behalf of a fetus which is not born alive, because a fetus is not a "person" within the meaning of our survival statute, section 611.20, The Code. We are satisfied that *McKillip* was correctly decided.

In Iowa, the right to maintain a suit for wrongful death is purely statutory, there being no such action at common law. *Egan v. Naylor*, 208 N.W.2d 915, 917 (Iowa 1973); *Major v. Burlington, Cedar Rapids & Northern Railway*, 115 Iowa 309, 88 N.W. 815 (1902). *See generally Justus v. Atchison*, 19 Cal.3d 564, 572–75, 139 Cal.Rptr. 97, 102–04, 565 P.2d 122, 127–29 (1977). The statute which affords this cause of action, section 611.20, provides: "All causes of action shall survive and may be brought notwithstanding the death of the person entitled or liable to the same."

Unlike the wrongful death statutes in many states, Iowa's death statutes have always been of the "survival" type. *Fitzgerald v. Hale*, 247 Iowa 1194, 1196, 78 N.W.2d 509, 510 (1956). Such a statute does not create a new cause of action in a decedent's survivors; rather, it preserves whatever rights and liabilities a decedent had with respect to a cause of action at the time of his death. *Wright v. Daniels*, 164 N.W.2d 180, 181 (Iowa 1969), *overruled on other grounds, Shook v. Crabb*, 281 N.W.2d 616, 618, 620 (Iowa 1979); *Cardamon v. Iowa Lutheran Hospital*, 256 Iowa 506, 520, 128 N.W.2d 226, 235 (1964). The cause of action thus preserved is deemed to accrue to the decedent's estate representative "at the time it would have accrued to the deceased if he had survived." § 611.22, The Code.

Because a wrongful death action in Iowa is purely statutory, our sole task is to construe the survival statute to determine if the plaintiff comes within its terms. *McKillip*, 191 N.W.2d at 708. We recognize that a majority of courts, in construing their state wrongful death or survival statutes, have reached a result contrary to that in *McKillip*; however, a significant number of states adhere to the minority view.[5] *See*

---

4. *See* Love, *supra*, at 623 ("As a matter of policy ... some courts and legislatures may want to confine the potential class of [consortium] plaintiffs to minor children and their parents. This would limit the right to recover to those persons who are most apt to have sustained a genuine loss.") (footnote omitted).

5. According to the citations listed in the dissent to this division, about one-third of the states whose highest courts have considered the ques-

*generally* Annot., 84 A.L.R.3d 411 (1978 & Supp.1981). Wrongful death statutes vary in wording from state to state and are likely to vary in intended meaning as well.[6] Therefore, what other courts have said about their state code provisions cannot be conclusive as to ours. We must make an independent determination of the intended meaning of our own statute.

When construing a statute, this court has a limited role. We must "[search] for the legislative intent as shown by what the legislature said, rather than what it should or might have said." Iowa R.App.P. 14(f)(13). The judiciary should not rewrite a statute under the guise of construing it. "If changes in a law are desirable from a standpoint of policy or mere practicality, it is for the legislature to enact them, not for the court to incorporate them by interpretation." *State v. Monroe*, 236 N.W.2d 24, 36 (Iowa 1975). Bearing these principles in mind, we turn to the task of reexamining our construction of the term "person" in section 611.20.

The ordinary meaning of the word "person" is a human being who has "attained a recognized individual identity" by being born alive. *Cardwell v. Welch*, 25 N.C.App. 390, 392, 213 S.E.2d 382, 383 (1975), *cert. denied*, 287 N.C. 464, 215 S.E.2d

623. For reasons we will explain, we believe this was the meaning the legislature had in mind when it enacted our survival statute.

Initially, we note that an unborn fetus was not generally considered a "person" at common law.[7] *Kilmer v. Hicks*, 22 Ariz. App. 552, 553, 529 P.2d 706, 707 (1974); *State ex rel. Hardin v. Sanders*, 538 S.W.2d 336, 338 (Mo.1976). If the legislature intended to abrogate that rule for the purpose of wrongful death actions under the survival statute, it presumably would have made that intention clear by a specific reference to the unborn in the statute.

In the criminal area, our legislature has not hesitated to be specific when it intended a statute to apply to fetuses. Murder is defined as the killing of "another person" with malice aforethought, § 707.1, The Code, but feticide and related crimes are treated separately in statutes that specifically refer to fetuses. *See* §§ 707.7–.10, The Code. From this we conclude, as did the California court in *Justus*, that when the legislature intends "to confer legal personality on unborn fetuses for certain limited purposes, it expresses that intent in specific and appropriate terms; the corollary, of course, is that when the [l]egislature speaks generally of a 'person,' ... it im-

tion follow the minority rule denying recovery for the wrongful death of a fetus.

**6.** The Restatement (Second) of Torts § 869, Comment f (1979) states that whether an action for wrongful death of a stillborn fetus can be maintained "will depend upon the language of the applicable statute and its construction by the court in determining whether the statute is intended to create the cause of action. The language of the statutes varies and no general rule can be stated for their construction."

**7.** In *Roe v. Wade*, 410 U.S. 113, 161–62, 93 S.Ct. 705, 731, 35 L.Ed.2d 147, 182, the United States Supreme Court made these pertinent observations:

In areas other than criminal abortion, the law has been reluctant to endorse any theory that life, as we recognize it, begins before live birth or to accord legal rights to the unborn except in narrowly defined situations and except when the rights are contingent upon live birth. For example, the traditional rule of tort law denied recovery for prenatal injuries even though the child was born alive. That

rule has been changed in almost every jurisdiction. In most States, recovery is said to be permitted only if the fetus was viable, or at least quick, when the injuries were sustained, though few courts have squarely so held. In a recent development, generally opposed by the commentators, some States permit the parents of a stillborn child to maintain an action for wrongful death because of prenatal injuries. Such an action, however, would appear to be one to vindicate the parents' interest and is thus consistent with the view that the fetus, at most, represents only the potentiality of life. Similarly, unborn children have been recognized as acquiring rights or interests by way of inheritance or other devolution of property, and have been represented by guardians *ad litem*. Perfection of the interests involved, again, has generally been contingent upon live birth. In short, the unborn have never been recognized in the law as persons in the whole sense. (Footnotes omitted.)

pliedly but plainly excludes such fetuses." *Justus*, 19 Cal.3d at 579, 139 Cal.Rptr. at 107, 565 P.2d at 132.

*McKillip's* holding that a fetus is not a "person" within the meaning of section 611.20 is reinforced by the fact that, in the ten years since that case was decided, the legislature has not responded by changing the statute. While such legislative silence is not conclusive, we may consider it as some evidence that the legislature is satisfied with the *McKillip* construction of the statute. *See General Mortgage Corp. of Iowa v. Campbell*, 258 Iowa 143, 152, 138 N.W.2d 416, 421 (1965). The fact that in the intervening period the legislature has considered and passed other legislation relating to the death of fetuses, as noted above, lends additional significance to its failure to amend the survival statute to include fetuses. *See* 1976 Sess., 66th G.A., ch. 1245(1), §§ 707–10; 1977 Sess., 67th G.A., ch. 148, §§ 2–4.

We recognize that *McKillip* is factually distinguishable from the case at bar because the fetus in *McKillip* was not viable at the time of injury, 191 N.W.2d at 707, while the Weitl fetus was alleged to be viable and nearly full term. However, we do not believe the legislature intended to include even a viable fetus within the class of "person[s]" under section 611.20. Had the legislature intended to include one class of fetuses and not another, there would have been even greater reason to specifically refer to such fetuses in the statute.

The history of section 611.20 also supports our conclusion that a fetus is not a "person" within the meaning of the statute. Except for a few minor changes in punctuation and grammar, the present section 611.20 is identical to the version of the statute which first appeared in the Iowa Code of 1873. *Compare* § 611.20, The Code 1981 *with* § 2525, The Code 1873. An earlier version of the statute did not contain the word "person," but said that "no cause of action

ex delicto dies with either or both [of] the parties, but the prosecution thereof may be commenced or continued by or against their respective representatives." § 2502, The Code 1851. *See also* §§ 2501, 1698–99, The Code 1851; § 3467, The Code, Revision of 1860. By its terms, this statute applied only to those who were or could have been "parties" to a tort cause of action at the time of death, and therefore would not apply to a fetus. There is no reason to believe that the legislature, in enacting the 1873 version, intended any substantive change when it used the phrase "person entitled or liable" instead of "parties."

Plaintiffs contend that adhering to *McKillip* will preclude our recognizing a live-born infant's cause of action for prenatal injuries, if and when such a question comes before us.[8] Although we do not intimate what our decision would be in such a case, we do not believe our construction of the statute would mandate such a result. Plaintiffs' argument is based on the fact that recovery for wrongful death under section 611.20 is generally allowed when the decedent would have been able to recover for the alleged wrongful act "had he survived the injury." *Egan*, 208 N.W.2d at 917. Plaintiffs contend that a cause of action for prenatal injuries, if recognized in Iowa, would be one that a stillborn fetus could have brought had it survived those injuries. Therefore, they argue, the statute must either preserve this cause of action for the fetus's estate, or we must be prepared to say that the cause of action does not exist in Iowa.

We do not agree that our construction of the statute presents such a dichotomy. Plaintiffs' argument begs the question. *See Graf v. Taggert*, 43 N.J. 303, 305–06, 204 A.2d 140, 142 (1964). The language in *Egan* construes section 611.20 and therefore applies only to a decedent who is a "person" within the meaning of the statute. Plaintiffs' argument erroneously assumes that a

8. Whether such a cause of action should be recognized has not yet been decided in Iowa. Virtually all jurisdictions that have considered the question now allow recovery of damages for negligently inflicted prenatal injuries if the infant is born alive. *See generally* Annot., 40 A.L.R.3d 1222, 1228, 1230–32 (1971 & Supp. 1981).

fetus is a "person" to whom the "had he survived" language of *Egan* applies. Without that assumption, the argument fails.

Furthermore, we note that courts in at least four states have had no difficulty in denying recovery for wrongful death of a fetus, even though those states had already recognized a live-born infant's cause of action for prenatal injuries. *See Graf*, 43 N.J. at 305, 311, 204 A.2d at 142, 145; *Endresz v. Friedberg*, 24 N.Y.2d 478, 483, 486, 301 N.Y. S.2d 65, 68, 71, 248 N.E.2d 901, 903, 905 (1969); *Cardwell*, 25 N.C.App. at 391–93, 213 S.E.2d at 383–84; *Carroll v. Skloff*, 415 Pa. 47, 48–50, 202 A.2d 9, 10–11 (1964).[9]

Plaintiffs also argue that it would be incongruous to immunize a tortfeasor from liability when he injures an unborn fetus badly enough to cause stillbirth, but to impose liability when the fetus is injured less severely and thus born alive. First, we note that this argument is premature because this court has yet to decide whether liability should be imposed in the latter case. Second, even assuming we would decide to impose liability in such a case, plaintiffs' argument would more properly be addressed to the legislature, because it attacks section 611.20 on policy grounds.[10] As we have noted, our role is to construe the statute as we believe the legislature intended it, not to debate its wisdom.

Accordingly, we hold that a fetus, whether viable or not, is not a "person" within the meaning of section 611.20. In so doing, we repeat the admonition in *McKillip* that we express no opinion regarding the existence of a fetus as a person in a biological, religious or philosophical sense. 191 N.W.2d at 709. The matter before us has been solely one of statutory construction.

Trial court's dismissal of Count III of plaintiffs' petition is reversed, its dismissal of Count IV is affirmed, and the case is remanded for further proceedings consistent with this opinion. Costs of this appeal shall be taxed one-half to appellants and one-half to appellees.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

UHLENHOPP, J., concurs.

REYNOLDSON, C. J. and HARRIS, J., concur in divisions I and II.

McCORMICK, J., concurs in division I and concurs in the result in divisions II and III.

McGIVERIN, J., with whom SCHULTZ, J., joins, concurs in divisions I and III, but dissents from division II.

LARSON, J., concurs in division I and the result of division II, but dissents from division III. REYNOLDSON, C. J., and HARRIS, J., join in the dissent to division III.

LeGRAND, J., concurs in division I, joins in McGIVERIN's, J., dissent as to division II and LARSON's, J., dissent as to division III.

McCORMICK, Justice (concurring specially).

I concur in division I and the result in divisions II and III of the court's opinion. I join division II for the reasons stated in the dissenting opinion in *Hankins v. Derby*, 211 N.W.2d 581, 586-89 (Iowa 1973). I join division III on the authority of *McKillip v. Zimmerman*, 191 N.W.2d 706 (Iowa 1971), which I believe was correctly decided.

McGIVERIN, Justice (dissenting in part).

I concur in divisions I and III of the majority opinion but dissent from division II.

9. Recently, in *Scott v. Kopp*, —— Pa. ——, 431 A.2d 959 (1981), the Pennsylvania Supreme Court reaffirmed its holding in *Carroll*.

10. One court has responded to a similar argument by noting that in the case of a child born alive with prenatal injuries, "the child bears the mark of defendant's wrong as a physical or mental deformity which could handicap him for the rest of his life; and could require him, his

parents or the state to expend considerable sums of money on his behalf. These reasons [for allowing recovery] do not exist where the child is stillborn." *Graf*, 43 N.J. at 312, 204 A.2d at 146. Persuasive responses to the argument are also made in *Endresz*, 24 N.Y.2d at 483–85, 301 N.Y.S.2d at 68–70, 248 N.E.2d at 903–04; and *Carroll*, 415 Pa. at 49–50, 202 A.2d at 11.

My dissent to division II rests upon three grounds. First, the interpretation by this court in *Hankins v. Derby*, 211 N.W.2d 581, 586 (Iowa 1973), of section 613.15, The Code, to cover "all of the elements of damages asserted by (the minor) plaintiff" including loss of companionship, society, care, attention, kindness, guidance, comfort and solace was a correct one. *See Iowa-Des Moines National Bank v. Schwerman Trucking Co.*, 288 N.W.2d 198, 204 (Iowa 1980); *Schmitt v. Jenkins Truck Lines, Inc.*, 170 N.W.2d 632, 664–65 (Iowa 1969). Thus, the determination, in *Hankins*, that section 613.15 provides a statutory means of recovering damages for a child's loss of parental consortium as long as the claim is brought by the injured parent or his estate need not be disturbed here. *See* 211 N.W.2d at 586. We should follow that precedent.

Second, section 613.15, as interpreted by *Hankins*, does not violate the equal protection clauses of U.S.Const. Amend. XIV and Iowa Constitution Art. I, sec. 6. The statute permits recovery by the minor child for loss of consortium of the parent but only procedurally requires that the recovery action be brought by the parent, or the parent's estate.

Third, this is an area where we should await legislative action, if such is needed. *Hankins*, 211 N.W.2d at 585. *See Fuller v. Buhrow*, 292 N.W.2d 672, 674 (Iowa 1980); *Stewart v. Madison*, 278 N.W.2d 284, 295–96 (Iowa 1979). In *Fuller*, we refused to usurp the duty of the legislature to consider modification of the doctrine of contributory negligence in favor of comparative negligence even though the latter doctrine had been adopted in thirty-five other states. *Fuller*, 292 N.W.2d at 673–74. It follows that we should similarly restrain ourselves here, because only two other states have allowed a minor child's independent cause of action for loss of parental consortium.

In *Stewart*, we also refused to abandon the doctrine of contributory negligence and drew an analogy to *Boyer v. Iowa High School Athletic Association*, 256 Iowa 337, 127 N.W.2d 606 (1964), to justify the refusal. 278 N.W.2d at 295–96. That analogy is appropriate here. In *Boyer*, we found that modification of the status of sovereign immunity was a matter for the legislature, even though the doctrine originated in the courts. 278 N.W.2d at 295. In *Stewart*, we said:

> Two considerations make the present case [modification of contributory negligence] an even less likely candidate for judicial change. First, the legislature had not directly inserted itself into the issue of sovereign immunity prior to *Boyer*; it remained almost solely a creature of the courts. On the other hand, the legislature has become involved in the areas of comparative and contributory negligence.

*Id.* Similarly, in the present case legislative involvement is present in section 613.15 and Iowa R.Civ.P. 8.

> A second reason for concluding that we should not seek the change requested is that there does not seem to be the general agreement of the need for a change that existed at the time of *Boyer*. In that case the desirability of such change was not even questioned, only the means of accomplishing it divided the court. Comparative negligence, on the other hand, has not been welcomed with the same unanimity, and although the current trend is toward its adoption, there is still resistance to the doctrine among some courts.

*Stewart*, 278 N.W.2d at 295. Only two states have extended an independent cause of action to children for recovery of loss of parental society due to injury of a parent. We should not change the law of this state when there is so little agreement that change is necessary. *See Duhan v. Milanowski*, 75 Misc.2d 1078, 1082, 348 N.Y.S.2d 696, 701 (1973).

The majority recognizes the complexity and uncertainty of their solution to this matter. Nevertheless, they have embraced a legal theory that has received only scant approval elsewhere. I must continue to adhere to our position in *Stewart*: "Whether Iowa should adopt the theory is basically one of policy, which would be better handled through the legislative process, if pos-

sible, with all of its means available for input into that decision." 278 N.W.2d at 296. Therefore, I would decline to extend an independent cause of action to children to recover for the loss of society and companionship of a parent who has been tortiously injured by a third party.

SCHULTZ, J., joins this dissent.

LARSON, Justice (concurring in part and dissenting in part).

I concur in Division I and in the result of Division II. I dissent from Division III.

The issue under Division III of the majority opinion is not whether we overrule *McKillip* because, as the majority points out, that case, involving a nonviable fetus, is distinguishable. Rather, the issue is whether we should expand the rule of *McKillip* to deny recovery for a *viable* fetus as well. Contrary to the assertions of the majority, denial of recovery is not mandated by our survival statute; it is in fact inimical to its very purpose. And a denial of this claim would further commit Iowa to what is undeniably the minority rule at a time when the recognition of claims on behalf of unborn children is so rapid and pronounced that courts and writers alike have noted the phenomenon.[1] This trend is illustrated by the fact that, of the seven jurisdictions addressing the issue for the first time between 1973 and 1980, six ruled in favor of recovery while only one denied it. *See* Kader, *The Law of Tortious Pre-Natal Death Since Roe v. Wade*, 45 Mo.L. Rev. 639, 663 (1980).

*I. Interpretation of section 611.20.* The majority does not contend the language of section 611.20 either expressly or impliedly *prohibits* recovery for a viable fetus; it merely contends that the legislature in 1851

did not intend to *permit* it. The fact is the legislature could not be presumed to have had an "intent," one way or the other on the issue, because of the paucity of medical knowledge at the time. *See Justus v. Atchison*, 19 Cal.3d 564, 579, 565 P.2d 122, 132, 139 Cal.Rptr. 97, 107 (1977) (Tobriner, J., concurring); *Britt v. Sears*, 150 Ind.App. 487, 494, 277 N.E.2d 20, 24–25 (1971) ("since actions for pre-natal injuries and death were then unknown in Indiana jurisprudence, our lawmakers very probably gave no thought to whether they were creating an action for pre-natal injury or pre-natal death"); *Mone v. Greyhound Lines*, 368 Mass. 354, 360 n.8, 331 N.E.2d 916, 919 n.8 (1975); Kader, *supra* at 658; Note, 46 U.Cinn.L.Rev. 266, 272 (1977); Annot., *Action for Death of Unborn Child*, 84 A.L.R.3d 411, 418–19 (1978).

The interpretation of statutes in these circumstances is discussed in K. Llewellen, *The Common Law Tradition* 374 (1960):

[T]he policy of a statute is of two different kinds.... On the one hand there are ideas consciously before the draftsmen, the committee, the legislature: a known evil to be cured, a known goal to be attained.... Here talk of "intent" is reasonably realistic....

But on the other hand—and increasingly as any statute gains in age—its language is called upon to deal with circumstances utterly uncontemplated at the time of its passage. Here the quest is not properly for the sense originally intended by the statute, for the sense originally to be *put into it,* but rather for the sense which *can be quarried out of it* in light of the new situation. Broad purposes can indeed reach far beyond details known or knowable at the time of drafting.... [T]he sound quest does not run primarily

---

1. *E. g., Wendt v. Lillo*, 182 F.Supp. 56, 62 (N.D. Iowa 1960) ("Seldom in the law has there been such an overwhelming trend in such a relatively short period of time as there has been in the trend toward allowing recovery for prenatal injuries to a viable infant.") *Wendt*, a diversity case, involved a claim for prenatal death of a viable fetus under Iowa law, an issue which had not yet been decided by our court. Judge Graven, in concluding Iowa would allow such

recovery, relied to a large extent on this trend. *See also* W. Prosser, *Handbook of the Law of Torts* § 55, at 336 (1971) (beginning in 1946, "a rapid series of cases" allowing recovery for prenatal injuries or death where the child is born alive, "brought about what was up till that time the most spectacular abrupt reversal of a well settled rule in the whole history of the law of torts").

in terms of historical intent. It runs in terms of what the words can be made to bear, in making sense in the new light of what was originally unforseen.

*See generally Eich v. Town of Gulf Shores,* 293 Ala. 95, 99, 300 So.2d 354, 357 (1974) ("It is often necessary to breathe life into existing laws lest they become stale and shelfworn."); 2A Sutherland, *Statutes and Statutory Construction* § 49.01, at 228 (1975) ("Legislative standards are often couched in general terms which are capable of embracing and intended to embrace future applications which are not and cannot be foreseen at the time of enactment. Therefore a statute may be interpreted to include circumstances or situations which were unknown or did not exist at the time when it was enacted.")

It must be conceded that the word "person" in section 611.20 is subject to more than one interpretation. Kader, *supra* at 657; Note, 46 U.Cinn.L.Rev., *supra* at 272. *Compare Kilmer v. Hicks,* 22 Ariz.App. 552, 554, 529 P.2d 706, 708 (1975) ("person" clear and unambiguous; held to *exclude* viable fetus) *with Verkennes v. Corniea,* 229 Minn. 365, 370, 38 N.W.2d 838, 841 (1949) ("person" clear and unambiguous; held to *include* viable fetus). In such instances, where the meaning of a word is unclear, the legislature has provided this court with, *inter alia,* two principles of construction: Section 4.6(1), The Code 1981, provides that "[i]f a statute is ambiguous, the court, in determining the intention of the legislature, may consider . . . [t]he object sought to be obtained," and section 4.2 similarly provides that a statute must be "liberally construed with a view to promote its objects. . . ." The principles of sections 4.2 and 4.6(1) have been applied by this court to our survival statute. *See, e. g., Blakeley v. Estate of Shortal,* 236 Iowa 787, 790, 20 N.W.2d 28, 30 (1945); *Wood v. Wood,* 136 Iowa 128, 132, 113 N.W. 492, 494 (1907) (section 611.20 is remedial legislation and "should be liberally construed" to effect its purpose); *accord, State ex rel. Odham v. Sherman,* 234 Md. 179, 198 A.2d 71, 73 (1964); *Mone v. Greyhound Lines,* 368 Mass. 354, 331 N.E.2d 916, 917 n.4 (1975); *White v. Yup,* 85 Nev.

527, 458 P.2d 617, 622–23 (1969); *Vaillancourt v. Medical Center Hospital,* 139 Vt. 138, 425 A.2d 92, 94 (1980); *Baldwin v. Butcher,* 155 W.Va. 431, 184 S.E.2d 428, 431 (1971); Note, 21 Villanova L.Rev. 994, 1002 (1976). As Justice Cardozo aptly stated:

Death statutes have their roots in dissatisfaction with the archaisms of the [common-law rule of no liability]. . . . It would be a misfortune if a narrow or grudging process of construction were to exemplify and perpetuate the very evils to be remedied. There are times when uncertain words are to be wrought into consistency and unity with a legislative policy which is itself a source of law, a new generative impulse transmitted to the legal system.

*Van Beeck v. Sabine Towing Co.,* 300 U.S. 342, 350–51, 57 S.Ct. 452, 456, 81 L.Ed. 685, 690 (1937).

What is the "broad purpose" of the survival statute which Professor Llewellen says will fill the void of ascertained legislative "intent"? The purpose of section 611.-20 was clearly to provide a remedy for a wrong inflicted, *Cardamon v. Iowa Lutheran Hospital,* 256 Iowa 506, 519–20, 128 N.W.2d 226, 234–35 (1964), since at common law there was no liability for wrongful death, W. Prosser, *Handbook of the Law of Torts* § 127, 901–902 (1971). To construe the word "person" narrowly, then, perpetuates the void in the common law: it allows a wrong to go unremedied, for in the normal course of events a healthy infant would have been born.

Another consideration also supports a broad reading of "person" in this context: Although this court has not been presented with the issue, virtually every jurisdiction facing the issue has permitted recovery for prenatal *injuries* when the fetus is born alive. *See* Prosser, *supra* § 55, at 336–37; Annot., *Liability for Prenatal Injuries,* 40 A.L.R.3d 1222, 1228 (1971). The majority in the present case even suggests we might allow recovery for prenatal injuries, when such a case is presented, while still denying it for a stillborn child. Assuming, *arguendo,* that this court would arrive at such a

conclusion, the resulting anomaly is obvious: "the greater the harm inflicted the better the opportunity for exoneration of the defendant." *Eich*, 293 Ala. at 97, 300 So.2d at 355; *accord, White*, 85 Nev. at 538, 458 P.2d at 622; *Stidam v. Ashmore*, 109 Ohio App. 431, 434, 167 N.E.2d 106, 108 (1959); Kader, *supra* at 646–47; Note, 15 J. Family Law 276, 297 (1977). And consider the case of a simultaneous injury to unborn twins where one dies a minute before delivery, the other a minute after. Recovery would be allowed for one twin but not for the other under this amazing rationale.

The distinction relied upon by the majority between the Lord Campbell-type death statutes and Iowa's "survival" statute provides no impediment to recovery here. Under a survival statute the claim of a personal representative springs not from the death of the person but from the original injury sustained by him, the claim for which is merely transferred to the executor or administrator. If we recognize, as virtually every jurisdiction has, that an injury to a fetus is compensable as to a live-born child, it is perfectly compatible with our survival statute to merely substitute the personal representative to pursue the claim when the decedent is prevented by death from doing so. This was in fact the reasoning in *Gorke v. Le Clerc*, 23 Conn.Sup. 256, 259, 181 A.2d 448, 450–51 (1962), which allowed recovery for a viable fetus under a survival-type statute.

*II. The majority rule.* Iowa's reference in section 611.20 to a "person" is not unique among the various states' death statutes; in fact, *most* statutes allow recovery only if the decedent was a "person." Kader, *supra* at 642–43. The overwhelming majority of courts facing the issue have held a fetus, at least by the stage of viability, is "a person," "one," "a child," or an equivalent under their respective death statutes. Moreover, the number of jurisdictions allowing recovery for prenatal death is steadily increasing.

In 1980, when Professor Kader's article was published, he stated that twenty-four states and the District of Columbia allowed recovery, thirteen denied it,[2] and thirteen states had not yet considered the matter. *Id.* at 644–45. Today the number of states allowing recovery for a viable fetus has risen to twenty-eight, while only ten deny it. Both Louisiana and New Mexico, which have opted for recovery on behalf of stillborn children since Kader's research was completed, have statutes applicable to the death of "persons"; the third state permitting recovery in the interim, Vermont, has a statute applicable to "one" who is killed.

The majority rule, allowing recovery on behalf of a viable fetus, is followed in the following jurisdictions: *Eich v. Town of Gulf Shores*, 293 Ala. 95, 300 So.2d 354 (1974) ("minor child" includes fetus); *Gorke v. Le Clerc*, 23 Conn.Sup. 256, 181 A.2d 448 (1962) ("person" includes viable fetus); *Worgan v. Greggo & Ferrara, Inc.*, 11 Terry 258, 50 Del. 258, 128 A.2d 557 (Super.Ct. 1956); *Simmons v. Howard University*, 323 F.Supp. 529 (D.D.C.1971) ("person" includes viable fetus); *Porter v. Lassiter*, 91 Ga.App. 712, 87 S.E.2d 100 (1955) ("person" includes fetus); *Chrisafogeorgis v. Brandenberg*, 55 Ill.2d 368, 304 N.E.2d 88 (1973) ("person" includes viable fetus); *Britt v. Sears*, 150 Ind.App. 487, 277 N.E.2d 20 (1971) ("child" includes a fetus "capable of independent life"); *Hale v. Manion*, 189 Kan. 143, 368 P.2d 1 (1962); *Mitchell v. Couch*, 285 S.W.2d 901 (Ky.1955) ("person" includes viable fetus: "[t]he most cogent reason ... for holding a viable unborn child is an entity within the meaning of the general word 'person' is because, biologically speaking, such a child is, in fact, a presently existing person, a living human being"); *Danos v. Pierre*, 383 So.2d 1019 (La.App.), *cert. granted*, 384 So.2d 985 (La.1980) ("person" includes seven-month old fetus); *State ex rel. Odham v. Sherman*, 234 Md. 179, 198 A.2d 71 (1964) ("person" includes viable fetus); *Mone v. Greyhound Lines*, 368 Mass. 354, 331 N.E.2d 916 (1975) ("person" in-

---

**2.** Iowa is shown to be a state denying recovery based upon *McKillip v. Zimmerman*, 191 N.W.2d 706 (Iowa 1971). However, as previously noted, *McKillip* is distinguishable from the present case.

cludes viable fetus); *O'Neill v. Morse*, 385 Mich. 130, 188 N.W.2d 785 (1971) ("person" includes viable fetus); *Verkennes v. Corniea*, 229 Minn. 365, 38 N.W.2d 838 (1949) ("person" includes viable fetus); *Rainey v. Horn*, 221 Miss. 269, 72 So.2d 434 (1954) ("party" includes viable fetus); *White v. Yup*, 85 Nev. 527, 458 P.2d 617 (1969) ("person" includes viable fetus); *Poliquin v. MacDonald*, 101 N.H. 104, 135 A.2d 249 (1957); *Salazar v. St. Vincent Hospital*, 95 N.M. 150, 619 P.2d 826 (Ct.App.), *cert. denied*, 96 N.M. 409, 631 P.2d 315 (1980) ("person" includes viable fetus); *Stidam v. Ashmore*, 109 Ohio App. 431, 167 N.E.2d 106 (1959) ("person" includes viable fetus); *Evans v. Olson*, 550 P.2d 924 (Okl.1976) ("one" includes viable fetus); *Libbee v. Permanente Clinic*, 268 Or. 258, 518 P.2d 636 (1974) ("person" includes viable fetus); *Presley v. Newport Hospital*, 117 R.I. 177, 365 A.2d 748 (1976) ("person" includes fetus); *Fowler v. Woodward*, 244 S.C. 608, 138 S.E.2d 42 (1964) ("person" includes viable fetus); *Nelson v. Peterson*, 542 P.2d 1075 (Utah 1975); *Vaillancourt v. Medical Center Hospital*, 139 Vt. 138, 425 A.2d 92 (1980) ("person" includes viable fetus); *Moen v. Hanson*, 85 Wash.2d 597, 537 P.2d 266 (1975) ("minor child" includes viable fetus); *Baldwin v. Butcher*, 155 W.Va. 431, 184 S.E.2d 428 (1971) ("person" includes viable fetus); *Kwaterski v. State Farm Mutual Auto Insurance Co.*, 34 Wis.2d 14, 148 N.W.2d 107 (1967) ("person" includes viable fetus).

In addition, support for the rule allowing recovery is favored by the weight of legal commentary. *See, e. g.*, 1 J. Dooley, *Modern Tort Law* § 14.04, at 299 (1977); 1 S. Speiser, *Recovery for Wrongful Death 2d* § 4.38, at 564 n.35 (1975) ("The opinions of recent cases permitting recovery are by far the better reasoned ones."); Kader, *supra* at 666; Note, 46 U.Cinn.L.Rev., *supra* at 272; Annot., 84 A.L.R.3d *supra* at 416–17 ("In attempting to compare and evaluate the various conflicting arguments, it would appear ... the more persuasive arguments are those which favor permitting a wrong-

ful death action to be maintained for the death of an unborn child."). *See generally* 2 F. Harper & F. James, *The Law of Torts* § 18.3, at 1028 (1956).

The minority rule, denying coverage for a viable fetus, is followed in these jurisdictions: *Kilmer v. Hicks*, 22 Ariz.App. 552, 529 P.2d 706 (1975) ("person" excludes viable fetus); *Justus v. Atchison*, 19 Cal.3d 564, 565 P.2d 122, 139 Cal.Rptr. 97 (1977) ("minor person" excludes viable fetus); *Stern v. Miller*, 348 So.2d 303 (Fla.1977) ("person" excludes seven-month old fetus); *State ex rel. Hardin v. Sanders*, 538 S.W.2d 336 (Mo.1976) ("person" excludes viable fetus); *Egbert v. Wenzl*, 199 Neb. 573, 260 N.W.2d 480 (1977) ("person" excludes viable fetus); *Graf v. Taggert*, 43 N.J. 303, 204 A.2d 140 (1964) ("person" not construed; wrongful death action may not be maintained on behalf of fetus because determination of "pecuniary injuries resulting from death" too speculative); *Endresz v. Friedberg*, 24 N.Y.2d 478, 301 N.Y.S.2d 65, 248 N.E.2d 901 (1969) ("decedent" excludes seven-month old fetus); *Cardwell v. Welch*, 25 N.C.App. 390, 213 S.E.2d 382, *cert. denied*, 287 N.C. 464, 215 S.E.2d 623 (1975) ("person" excludes viable fetus); *Scott v. Kopp*, —— Pa. ——, 431 A.2d 959 (1981) (wrongful death action may not be maintained on behalf of eight-month old fetus); *Hamby v. McDaniel*, 559 S.W.2d 774 (Tenn.1977) ("person" excludes viable fetus; based on view that Tennessee wrongful death statute to be *strictly* construed);[3] *Lawrence v. Craven Tire Co.*, 210 Va. 138, 169 S.E.2d 440 (1969) ("person" excludes viable fetus). Iowa, as previously noted, has followed the minority rule as to a nonviable fetus. *McKillip v. Zimmerman*, 191 N.W.2d 706 (Iowa 1971).

The majority opinion says a viable fetus is not a "person" under our survival statute; however, nineteen of the jurisdictions noted above have expressly held viable fetuses are "persons" for purposes of their respective death statutes, while only six have held they are not.

---

**3.** The Tennessee legislature effectively overruled the *Hamby* decision by statute in 1978.

*See* Tenn.Code Ann. § 20–607 (Supp.1977), *as amended by* 1978 Tenn.Pub.Acts ch. 742, § 1.8.

*III. The effect of Roe v. Wade.* In support of its assertion that an unborn child is not a "person" at common law, the majority quotes at length from *Roe v. Wade.* That case, however, involved a woman's right to terminate her pregnancy; it was not an action for wrongful death. The privacy interest of the woman, which was the basis of *Roe v. Wade,* is not involved here; in fact, no personal interests are advanced by the majority's view here except those of a tortfeasor, who escapes liability. Furthermore, the statement in *Roe v. Wade,* that "person" under the fourteenth amendment does not include an unborn child, 410 U.S. at 158, 93 S.Ct. at 729, 35 L.Ed.2d at 180, does not preclude our finding, for purposes of our survival statute, that it does. Words used in different contexts may be interpreted differently. At least six of the states which have held "persons" under their death statutes included viable, unborn children, have done so since *Roe v. Wade* was decided: *Danos,* 383 So.2d at 1021 (La.); *Salazar,* 95 N.M. at 154, 619 P.2d at 830; *Mone,* 368 Mass. at 360, 331 N.E.2d at 917; *Libbee,* 268 Or. at 267, 518 P.2d at 639; *Presley,* 117 R.I. at 188, 365 A.2d at 753; *Vaillancourt,* 139 Vt. at 143, 425 A.2d at 94; *see* Kader, *supra* at 659 ("Opinions since *Roe v. Wade* advocating recovery [for a viable fetus] either ignore *Roe* or distinguish it.") Thus, the trend toward allowing recovery has not been blunted by that decision. Kader, *supra* at 663.

It has been argued that *Roe v. Wade* actually *favors* recovery for a viable fetus because of its recognition that a state has an "important and legitimate interest in potential life," which becomes a "compelling" interest at the point of viability, 410 U.S. at 162-63, 93 S.Ct. at 731, 35 L.Ed.2d at 183. *See* Kader, *supra* at 660-62, where the author discusses several cases taking this approach. While I do not necessarily adopt that view, it further demonstrates that *Roe v. Wade* is at least questionable authority for denying recovery in the present case.

If we are to give present-day meaning to our survival statute, we must conclude that an unborn child, at least at the stage of viability, is a "person" within its scope, a view supported by the great weight of authority. Accordingly, the application of the rule of *McKillip* should not be extended to the facts of this case.

I would reverse the ruling addressed in Division III and permit the matter to proceed to trial.

REYNOLDSON, C. J., and HARRIS, J., join in this dissent.

LeGRAND, Justice (concurring in part and dissenting in part).

I concur in division I of the court's opinion. I join Justice McGiverin's dissent as to division II, and I join Justice Larson's dissent as to division III.